# JUNE TERM.

## WHEELING.

Doolittle *et al. v.* County Court of Cabell County.

Submitted June 28, 1886.—Decided July 2, 1886.

1. The first and second points of the syllabus in *Fisher* v. *The City of Charleston*, 17 W. Va. 695, and the sixth point of the syllabus in *Fisher* v. *The Mayor, Recorder, &c., of the City of Charleston*, 17 W. Va. 628, approved and acted upon. (p. 166.)

2. The rule, that a demurrer reaches back to the first fault in the pleadings of either party, is as applicable to pleadings in *mandamus* cases, as it is in ordinary suits at common law. (p. 172.)

3. Upon a motion to quash a *mandamus nisi*, which is the equivalent of a general demurrer, the Court will not quash the writ, if

the defect in it is merely formal, especially when it appears from the petition, on which the writ was issued, and which has been sworn to, that such defect could be truthfully corrected and is such, as the Court, if asked, would permit to be corrected by amending the writ at bar.   (p. 170.)

4. Under sec. 15 of ch. 39 of the Code, as amended by ch. 5 of the Acts of 1881, the petition should conclude with a prayer, that the county court should make an order, that a vote be taken at the next general election to be held in the county upon the question of the re-location of the county-seat at the place named in said petition; and this place is designated with sufficient certainty, when it is called a certain city or town, and there should be no designation of the particular locality in such city or town as the place, where the county-seat is to be located, no matter how much extent of land is covered by the boundaries of such city or town, or how sparse in portions of these boundaries may be the population.   (p. 183.)

5. This law is complied with, if upon the filing of such petition it be shown, that it is signed by one fifth of all the legal voters of the county estimated by allowing one vote for every six persons as shown by the last preceding census, though the petition be undated and no proof is offered to show, either when the petition was signed by any of the signers, or that any of them were voters, at the time it was signed.   (p. 181.)

6. The questions, whether such petition should be allowed to be filed, and whether the order, asked for in the petition should be granted by the county court, are not judicial questions; but it is an absolute duty imposed upon the county court, when such a petition, as is prescribed by this law, is presented and duly verified by affidavit and signed by the requisite number of legal voters of the county, to permit it to be filed and to make the order prayed for in the petition; and the court having no discretion to refuse to permit such petition to be filed or to make such order, if it refuses so to do, such ministerial duty can be enforced by *mandamus*.   (p. 182.)

*T. L. Michie* and *Simms & Enslow* for petitioners.

*Knight & Couch* and *B. J. McComas* for respondents.

Statement of the case by GREEN, JUDGE:

On June 2, 1886, E. S. Doolittle and 806 others, citizens and voters of the county of Cabell in the State of West Virginia, presented to this Court their petition setting forth that the county-seat of said county is now located at Barboursville, and that the petitioners, legal voters of said county, signed a petition to the county court of said county praying

that said county court would make an order, that a vote on the re-location of said county-seat at the city of Huntington in said county be taken at the next general election on Tuesday next after the first Monday in November, 1886; that E. S. Doolittle and two others of said petitioners verified the petition by making affidavit, that the subscribers thereto were, as the affiants verily believed, legal voters of said county; that at a regular session of said county court on April 28, 1886, after said petitioners presented their petition to the said county court and asked leave to file it at said session of said court and proved as adjudged by said county that said petitioners, whose names were signed to said petition, were and are legal voters of said county, they proved by the census of 1880, that they were and are greater in number than one fifth of all the legal voters of said county ; that thereupon the said county court refused to allow said petition to be filed and refused to make any order submitting the question of re-location of said county-seat to the voters of said county, as prayed for in said petition, which action of the court was excepted to by the petitioners, and a bill of exceptions setting out the facts and the action of the court was duly signed by said court and made a part of the record, a copy of which is filed with the petition as a part thereof. This action of the said county court, the petition alleges, was illegal, said court having no discretion in the matter but being bound to permit the petition to be filed and to make the order to submit the re-location of said county-seat to the voters of said county as prayed for in said petition.

The petition to this Court then sets forth the reasons, why said petition was not presented to the judge of the circuit court of Cabell and concludes as follows:  " Your petitioners therefore pray, that a writ of *mandamus* be awarded by your honorable Court to the said 'the county court of Cabell county and Thomas Thornburg, Thomas Bias and G. W. Hackworth, commissioners constituting said county court of Cabell county, commanding it and them to allow the aforesaid petition to be filed and to make an order, that a vote be taken at the next general election to be held in the said Cabell.county, to-wit: on the Tuesday after the first Monday in November, 1886, upon the question of the re-location of

the said county-seat of said Cabell county at the said city of Huntington in the said county." This is signed by these petitioners by their counsel. The facts stated in the petition are sworn to as true by E. S. Doolittle one of the petitioners.

The entire record of the proceedings in said matter in the county court of Cabell hereby certified by its clerk is filed with said petition as a part thereof; and it shows, that the facts set forth in said petition to this Court are true. It also shows that the petitioners proved by the census of 1880, that the said petition to the county court of Cabell was signed by more than one fifth of all the legal voters of said county estimated by allowing one vote for every six persons in said county, as shown by the last preceding census, as provided for by law. The petition to the county court is set out in this copy of the record at length with all the signatures thereto. There is no date to the petition. The affidavits to it as stated above are also set forth in this record and are such, as are required by this law. This record shows also, that the citizens of Barboursville by their counsel objected to the filing of this petition and in support of their objection introduced the map of the city of Huntington and by it proved, that the corporate limits of the city extended from the upper or east side of the Guyandotte river down the Ohio river a distance of three miles or more and from the Ohio river back to the hills a distance of one and one half to two and one half miles; that only a portion of said space was built up as a city or town, the larger part being near the center; that a portion of the said limits were farms, fields and forest. The county court thereupon put on said record its opinion, that said petition was not sufficient, and sustained this objection of the citizens of Barboursville and refused to allow said petition to be filed. The petition to the county court of Cabell referred to is set out at length in said record of the county court of Cabell and is as follows:

" *To the worshipful the county court of Cabell county, West Virginia:*

"Your petitioners whose names are hereto signed would respectfully represent unto the court that they are citizens and voters of Cabell county aforesaid, and they are desirous of the re-location of the county-seat of said county of

Cabell, that the said county-seat may be removed from the town of Barboursville to and re-located in the city of Huntington in said county. Your petitioners would therefore most respectfully pray that your honorable court will make an order that a vote may be taken upon the question of such re-location at and to the city of Huntington aforesaid, at the next general election to be held in said county on Tuesday next, after the first Monday in November, 1886, and in duty bound, they will ever pray, &c."

Then follow the signatures of E. S. Doolittle and 806 others and the affidavits of E. S. Doolittle and E. S. Buffington and E. Kyle also signers to said petition. Doolittle swears that he verily believes, that the signers to said petition are legal voters of said county, and that he had charge of said petition, while it was being signed. His affidavit is dated April 15, 1886. E. S. Buffington states in his affidavit, that he knows all the signers of said petition personally, he being the deputy sheriff of said county, except sixty, whose names are specified, and he verily believes them to be legal voters of said county. Kyle in his affidavit states that he has been from 1881 to 1884, the sheriff of said county, and that he knows all except eight of the sixty persons stated to be not personally known to Buffington, and that he verily believes them to be legal voters in said county.

Upon June 2, 1886, this Court acted on this petition and dispensing with a rule ordered a *mandamus nisi* to issue at once according to the prayer of the petition returnable on June 18, 1886, at 10 o'clock A. M. The respondent appeared on that day and moved to quash the *mandamus nisi*. This *mandamus nisi* simply recites, that on June 2, 1886, came before this Court E. S. Doolittle and 806 other citizens and voters of Cabell county and presented a petition praying a writ of *mandamus* against the county court of Cabell county and Thomas Thornburg, Thomas Bias and G. W. Hackworth commissioners constituting said county court, as in said petition is set forth, upon consideration whereof a writ of *mandamus nisi* is awarded against said court and parties commanding it and them to allow the petition set out as above stated to be filed at the July term, 1886, by the county court of Cabell, or that it and they show cause on said return-day

why it and they refuse so to do. No writ of *mandamus nisi* such, as is directed in said order, was in point of fact issued, as the order on its face provided, as such orders frequently do, that a service of an attested copy of this order setting forth the above recitals shall be considered service of the writ of *mandamus nisi* ordered to be issued. An attested copy of this order was duly served on all the respondents, and on the return-day of said *mandamus nisi* they appeared in this Court and moved to quash said writ; and after due consideration this Court on June 21, 1886, quashed this writ but ordered a new writ of *mandamus nisi* to be issued returnable to June 28, 1886, at ten o'clock A. M. This writ of *mandamus nisi*, as it really constitutes the declaration in this case, I will give at length. It is as follows:

" THE STATE OF WEST VIRGINIA,

" *To the county court of Cabell county and to Thomas Thornburg, Thomas A. Bias and G. W. Hackworth, Commissioners constituting said county court, Greeting:*

" WHEREAS, It has lately been represented to the Judges of our Supreme Court of Appeals on behalf of E. S. Doolittle and 806 others, citizens and voters of Cabell county, that at a county court of Cabell county, held on April 28, 1886, at a regular term of said court, a petition signed by 807 citizens and voters of Cabell county, duly verified as required by law by the affidavits of E. S. Doolittle, E. S. Buffington and E. Kyle, that the subscribers to said petition were legal voters of said county, as they verily believed, praying the said county court to order a vote to be taken at the general election to be held on Tuesday next after the first Monday in November, 1886, upon the question of moving the county-seat of Cabell county from the town of Barboursville and relocating the same at the city of Huntington, in said county, and it was proven to and adjudged by the said county court that the said petition was signed by more than one fifth of all the legal voters of said county, but the said county court refused to permit the said petition to be filed and refused to make the order prayed for therein. Now, therefore, we being willing that justice be done in the premises, do command the county court of Cabell county, and each of you, the said commissioners constituting the same, to permit the said

petition of E. S. Doolittle and 806 others to be filed at the July term of the said county court in 1886, and that at that term, you, the said commissioners, and the county court of Cabell county, do make an order submitting to a vote of the voters of said county at the general election to be held on the Tuesday next after the first Monday in November, 1886, the question of removing the county-seat of Cabell county from the town of Barboursville and re-locating the same at the city of Huntington, as in said petition is prayed; or that you appear before the judges of our Supreme Court of Appeals at their court room in the city of Wheeling on June 28, 1886, at 10 o'clock A. M., and show cause, if any you can, why refuse so to do. Witness: O. S. Long, clerk of the Supreme Court of Appeals of West Virginia, this June 21, 1886, and in the 24th year of the State,

                         " O. S. LONG."

The order directing this writ has in it all the recitals contained in the writ and is a full description of the writ to be issued. This writ was duly served, and on the return day the respondents all appeared and moved to quash the same. The respondents also filed their return to the writ, which was substantially as follows: That they did heretofore refuse to permit said petition to be filed in the said county court of Cabell county and ought not to be commanded to permit said petition to be filed at the July term of the county court of Cabell in 1886, or at any other time for the following reasons: 1st. Because the said petition is not sufficient in law. 2nd. There was no evidence before the county court of Cabell showing the time when said petition was signed, or that the signers of said petition or any of them were legal voters of Cabell county at the time they severally issued said petition. 3rd. The refusal to allow said petition to be filed was a judicial act of the county court of Cabell which can only be reviewed in the manner prescribed by law. 4th. Because no definite or certain place is named in said petition for the proposed location of the county-seat of said county of Cabell, the only place mentioned being the city of Huntington, which as incorporated extends from a point on the east side of the Guyandotte river down the Ohio river three and a-half miles and extends back from the Ohio river

nearly the same distance embracing an area of nearly twelve square miles. A large portion of this area is composed of mountains ; another large portion is composed of river bot- tom farms divided into orchards, pasturage and cultivated land. There is a small portion of the corporate limits, and but a small portion, in the northeast corner thereof, upon which has been built a number of dwellings and business houses, and which has been laid off in streets and alleys. There are three or four other places within the said corpor- ate limits, where houses have been built in groups, which constitute, as it were, several towns or villages, which are dispersed at intervals over the river bottom embraced in said corporate limits. The town of St. Cloud bounds the corpor- ate limits of Huntington on the west. The town of Guyan- dotte bounds the city of Huntington on the, east and has a population of about 1,300. The corporate limits of the city of Huntington embrace quite a large portion of the territory within the corporate limits of the town of Guyandotte.

This answer concludes as follows : "In view of these facts as proven and taken cognizance of by the said county court of Cabell county, it and they were of opinion that the place named in said petition was too vague and uncertain ; that a fair and enlightened expression of the wishes of the legal voters of the said county could not be obtained, nor the county court by any power conferred upon it carry the same into effect and comply with the provisions of the statute in the event of a vote in favor of such re-location in reference to the removal of the records, erection of build- ings, &c. For these reasons they refused to permit said pe- tition to be filed ; and they never acted on any other ques- tion." This answer is sworn to by Thos. Thornburg. It was demurred to by the plaintiffs, and issue was joined on the demurrer, and the cause was submitted to this Court for its decision.

Opinion by GREEN, JUDGE :

Under the third section of Article VIII. of our present Con- stitution this Court has original jurisdiction in cases of *man- damus* (Warth's Code, p. 23). By virtue of this provision of our Constitution there was presented to this Court a peti-

tion of 807 legal voters of Cabell county for a writ of *mandamus* to the county court of Cabell county and to the three commissioners composing said court commanding it and them to allow a petition signed by said 807 legal voters of said county asking the re-location of the county-seat of Cabell county at a place named therein to be filed in said court and to make an order, that a vote be taken at the next general election to be held in said county on the Tuesday next after the first Monday in November, 1886, upon the question of the re-location of the county-seat of said county at the city of Huntington in said county; which petition to the county court of Cabell county, as alleged in said petition to this Court for said *mandamus*, was such a petition, as is provided for in sec. 15 of ch. 39 of the Code as amended by ch. 5 of the Acts of 1881, and was sworn to as required by said section and asked that the county court of Cabell would make an order that a vote be taken upon the question of the re-location at said city of Huntington at said next general election, and that this petition had been presented by said petitioners to the county court of Cabell county on April 28, 1886, during a regular term of said court, but the court refused to allow the said petition to be filed.

The question now before us is whether a peremptory writ of *mandamus*, such as is asked of this Court, should be awarded.

I will consider first so much of the law in *mandamus* cases, as is necessary to determine this question, and then apply the same to this case as set out at length in the preceding statement. The proceedings in such cases have been so fully settled in this State, that in order to determine, whether the proceedings in this case are such, as the law in this State requires, it will only be necessary to quote some of the points of the syllabus in *Fisher* v. *The City of Charleston*, (17 W. Va. 595). These points are as follows :

"1. The usual and proper mode of proceeding in this State in cases of *mandamus* is for the plaintiff to file a petition in the court having jurisdiction of the case setting forth the facts of his case, on which he bases his claim to a *mandamus*, and praying for the writ, specifying in his petition the specific act or acts, which he asks to have the defendant com-

manded to perform.    The facts set out in this petition must
be such as *prima facie* entitle the plaintiff to the relief he
seeks, and the petition should be supported by affidavit, if
filed by a private person.    On filing of this petition which is
*ex parte*, the court, if a *prima facie* case is thereby made out,
on the plaintiff's motion makes an order, which reciting that
the petition is filed orders, that the defendant after being pre-
viously served with a copy of the order to appear on a certain
day fixed by the court and show cause if any he can, where-
fore a writ of *mandamus* should not be awarded the plaintiff
to command the defendant to do the specified acts, which
command should correspond with that asked for in the peti-
tion.    If on the return-day of this rule it has been served
and the defendant files no answer, the court either orders a
peremptory *mandamus* to issue against him or compels him
to file an answer, as one or the other may be proper in the
particular case.    If he files an answer, and it be insufficient at
law, the court proceeds as if no answer had been filed ; if it
be sufficient in law, no peremptory writ of *mandamus* is
then issued, but if the court sees, that there is a disputed
question of fact between the parties, it should order an alter-
native writ of *mandamus* to be issued, and it does not permit a
demurrer or replication to be filed to the answer to the rule;
or the court may and usually does dispense with the issuing
a rule to show cause why a *mandamus* should not issue, and
immediately on the filing of the petition, if a *prima facie* case
is thereby made out, orders an *alternative* writ of *mandamus* to
be issued.    The alternative writ sets forth by distinct recital,
and not by reference to the petition, all the facts necessary to
show the plaintiff's right to the writ of *mandamus* which he
asks; and by it the defendant is commanded to perform the
particular act specified in it (which should properly be the
same as that stated in the rule or petition, but which may be
different) or that cause be shown to the contrary in a given
time.    It is regarded as the plaintiff's declaration.    If the de-
fendant does not make a return to this alternative writ, the
court may either order a peremptory writ of *mandamus* or
enforce the filing of a return, as may be proper in the particu-
lar case.    The defendant may move to quash the alterna-
tive writ, which is equivalent to a demurrer to it, or he may

make a return. This return is regarded as his plea; and it may be replied to, and the pleading proceed, as in ordinary common law suits, till an issue of law or fact is reached and tried.

" 2. To the pleadings in cases of *mandamus* the ordinary rules of pleading are applied, neither greater nor less certainty being required in them than in the pleadings in ordinary common law suits. But the facts set forth by the plaintiff in the alternative writ of *mandamus* are set forth by way of recital and not in the positive manner that is required in an ordinary declaration in a common law suit."

The sixth point of the syllabus in *Fisher* v. *The Mayor, Recorder, &c., of the City of Charleston* (17 W. Va., 628) is: "The peremptory writ of *mandamus* must strictly follow the command of the alternative writ of *mandamus*."

In the case before us it is obvious, that the petition to this Court, the substance of which has been set out in the statement of this case, and which was supported by a proper affidavit, set out facts, which *prima facie* entitled the plaintiffs to the relief they sought; and this Court dispensed with the issuing of a rule to show cause why a *mandamus* should not issue, and after carefully considering the petition ordered an alternative writ of *mandamus*, or *mandamus nisi*, as it is usually called, to be issued. In this case it is obvious that, as in most cases, this alternative writ of *mandamus* answered every possible purpose, which a rule to show cause, why a *mandamus* should not issue, could have done. To have issued such a rule before the alternative writ of *mandamus* was ordered would in this case have simply caused delay and trouble without effecting any useful end. On the return-day of this alternative writ of *mandamus* the defendants moved to quash it. This *mandamus nisi* was, as we have seen, the plaintiffs' declaration and should have set forth by distinct recital, and not by reference to the petition, all the facts necessary to show the plaintiffs' right to the writ of *mandamus*, which they asked. The defendant's motion to quash this alternative writ was equivalent to a demurrer to the declaration contained in the recital, with which the writ of *mandamus nisi*, or alternative writ of *mandamus* commences. This Court without hesitation quashed this first alternative

writ of *mandamus*; for the recitals in it, which constituted
the plaintiffs' declaration, were obviously insufficient as a
declaration, failing entirely to set forth the facts necessary to
show the plaintiffs' right to the writ of *mandamus* they asked.
Not a single fact is set forth in the recitals of this alternative
writ of *mandamus* except the simple fact, that a petition had
been filed in this Court asking a writ of *mandamus* against
the defendants. Of course no issue could be made on such
recitals, as were in this alternative writ of *mandamus*, not a
single material fact, upon which this writ of *mandamus* was
asked, being stated in the writ.

This first alternative writ of *mandamus* was fatally defective
in this also, that it simply commanded the county court of
Cabell county to permit the petitioners to file at the July
term, 1886, their said petition. We have seen, if on the re-
turn of this first alternative writ of *mandamus* a peremptory
writ of *mandamus* had been issued, it would have had to fol-
low strictly the command contained in this first alternative
writ, and this would have availed the plaintiffs nothing;
for they did not want simply to file this petition in the county
court of Cabell, they also wanted the county court of
Cabell commanded to make an order submitting to a vote of
the legal voters of said county at the next general election
the question of moving the county-seat of Cabell from the
town of Barboursville and re-locating the same at the city of
Huntington. This Court promptly quashed this first alter-
native writ of *mandamus* but awarded at once another alterna-
tive writ returnable to June 28, 1886, at ten o'clock A. M.
This second alternative writ was promptly issued, and the
palpable errors above pointed out in the first writ were
corrected. On the return of the second writ the respondents
moved to quash it and also made a return thereto, which is
set out at considerable length in the statement of this
case.

There is, what may be perhaps regarded as one formal de-
fect, in the second writ of *mandamus nisi*, the real declara-
tion in this case. This writ is copied at length in the state-
ment of the case. The recital in this writ sets forth, as it
should, distinctly and not by reference to the petition all the
facts necessary to establish the plaintiffs' right to the writ of

*mandamus,* which they ask.   This is required to be done with neither more or less accuracy than in a declaration in an ordinary common law suit, except that they may be and are set out by way of recital and not positively.   It is claimed that the rules of pleading are violated in the imperfect manner in which one material fact is stated in this writ of *mandamus nisi.*   It is in it said : "and it was proven and adjudged by the said county court, that the said petition was signed by more than one fifth of all the legal voters of said county." It is insisted, that there should have been added as material to make out any case for the plaintiffs, these words : "Estimated by allowing one vote for every six persons in said county as shown by the last preceding census," this being the mode prescribed by the statute of ascertaining, whether or not, a sufficient number of voters had signed the petition. This addition could have been truthfully made, as is shown by the record of the proceedings of the county court of Cabell county in this matter filed with the petition to this Court, for a *mandamus.*   If this had been done, this *mandamus nisi* would have substantially alleged, that it was proven to the county court and adjudged by them, that the statute-law of West Virginia had been literally complied with by the petitioners.   This mode of estimating the number of the voters in the county being specified, as we shall see, in the statute-law.   Though this objection to this writ of *mandamus nisi* was pressed in the argument by the counsel for the respondents on the motion to quash this writ of *mandamus nisi,* we think it should not prevail, because when it is stated that "it was proven to and adjudged by the county court, that the said petition was signed by more than one fifth of all the legal voters of said county," the law presumes that this was proven in a legal manner, that is, in the mode prescribed by the statute-law, when estimated by allowing one vote for every six persons in said county as shown by the last preceding census.   For this reason and because this inaccuracy, if it is to be regarded as a blunder, is of a formal character, which this Court would have permitted to be amended at the bar, and which we know from the records of the county court of Cabell could have been amended truthfully, so as to make the writ perfectly accord

with the law, we do not think this is a good ground for quashing this writ of *mandamus nisi*.

All the other objections to this writ of *mandamus nisi* made by the respondents and their counsel go to the merits of the case ; and if they are in law good and valid objections, as they are of such a character, that they could not be amended, they must end this case by a judgment in favor of the respondents.

The return made by the respondents, which, we have seen, is to be regarded as their plea, and which was demurred to by the plaintiffs, seems to me to be quite informal and to violate the correct rules of pleading in common law suits, which are applicable to it in some respects. I have set forth in the statement of this case the substance of this return. The first, second and third reasons given, why the *mandamus nisi* should be quashed, are really covered by the motion to quash, they being objections, which, if sound, appear on the face of the writ. For though the second of the assigned reasons is put forth in a form, as if some new facts in avoidance of the writ of *mandamus nisi* were brought forward, yet if such new facts were valid objections it would have been necessary to allege the reverse of them in the writ to make it good.

The only real pleas or defences set out in this return are the facts stated in the fourth or last reason assigned in said return why a peremptory writ of *mandamus* should not be issued. They amount in substance to an allegation, that the boundaries of the city of Huntington are so extensive, that the asking, that the county-seat of Cabell be located at the city of Huntington is not within the meaning of the statute such a designation of the place, as would justify the county court of Cabell in ordering a vote to be taken with reference to its location there. The facts contained in this fourth reason against the allowance of a peremptory writ of *mandamus* are set forth at considerable length in the statement of the case and very much in the same manner as in the return by the respondent. This manner of stating these facts and making this defence, it seems to me, violates the rules of pleading in an ordinary common law suit. These rules of pleading are applicable to this return, which is really the respondents' plea. And the plaintiffs have demurred to this

return. But as I have concluded, that none of those facts, even if ever so formally pleaded, would have been a good defence, I need not point out what I suppose are the defects in the mode of stating them. There could obviously be no amendment of this return according to the truth of the case as appearing in the record, which would according to the views of the law, which I take, save this return from being bad on general demurrer; and this will of course dispose of this case finally by this Court issuing the peremptory writ of *mandamus* asked by the plaintiffs.

I would simply say that this demurrer to this return really covers all the questions involved in this case, because upon this demurrer we will look back to the first error in the pleadings and decide accordingly. If therefore there is a fatal error in the *mandamus nisi*, the case will be decided against the plaintiffs on this demurrer to the return. (*People* v. *Ransom*, 2 N. Y. 490; *Commercial Bank* v. *Canal Commissioners*, 10 Wend 26; *Fisher* v. *The City of Charleston*, 17 W. Va. 614). Therefore the case before us would really be essentially the same, if the respondents had not moved to quash this *mandamus nisi*. The whole case is presented by the demurrer to the return of the respondents.

Having disposed of all the formal questions involved in this case, I now propose to consider it on its real merits as presented by the facts appearing in the *mandamus nisi* and in the return, which facts are really undisputed, except only that it would appear that the facts stated in the return are claimed to be exaggerated, as for instance the extent of the land included in the boundaries of the city of Huntington. But this diversity as to the facts is such as could, according to the views I entertain, in no manner affect the case on its merits.

First—I will consider so much of the law in *mandamus*-cases as when applied to these undisputed facts will decide this case. It may be regarded as settled, that *mandamus* will lie to compel the performance of duties purely ministerial in their nature and so clear and specific, that no element of discretion is left in their performance. This, it would seem all the authorities concur, would justify the issuing of peremptory writ of *mandamus*. But the authorities differ much as

to what are to be considered ministerial and what judicial duties. In such a condition of the law it becomes us to examine the Virginia decisions, which having been pronounced prior to the formation of this State are binding authorities on this Court, and to endeavor in this or any other case, where the question is, can a *mandamus* issue against a court to compel the performance of a specific act, to endeavor to follow the spirit of these old Virginia cases. It has been repeatedly decided in Virginia in these old cases, that an order made by a county court directing a deed to be recorded is a mere ministerial act; and if such court improperly refuses to admit a deed to be proved and to order it to be recorded, the court may be compelled to do so by a peremptory writ of *mandamus*. (*Dawson* v. *Thruston*, 2 H. & M., 132; *Manns* v. *Givens*, 7 Leigh 689).

In this last case the county court was compelled by *mandamus* to admit a deed of emancipation to record, though it distinctly appeared, that before so doing they would have to make up their minds as to several doubtful questions of law. For instance in that case one of the attending witnesses thereto was dead, and the other resided out of the Commonwealth; and though the proceeding to admit the deed to record was an *ex parte* proceeding, yet his deposition was taken to prove the execution of the instrument. Proof was also given of the handwriting of the deceased witness and of the maker. Questions arose in the case as to whether the slaves emancipated by the deed could under the Virginia law appear in the proper county court by counsel and offer to prove the deed and ask to have an order made directing it to be recorded; and also whether this proof by deposition could be recorded or considered. The county court seemed to think, that under the law this deed of emancipation could not be by it legally ordered to be recorded, and refused so to do. But it was compelled so to do by *mandamus*, the Court of Appeals deciding each of these disputed law questions in favor of those offering to prove the execution of the deed and also that this proof was sufficient.

This case would seem to proceed upon the ground that the question, whether certain duties are *ministerial* or judicial, depends upon the general nature of the duties to be per-

formed, and if these duties be clearly *ministerial* in their character, the fact, that the county court or other officers in the performance of such ministerial duty was necessarily compelled in declining to perform it, to decide disputed questions of law, would not render the duty judicial; that this duty of admitting a deed to record would seem beyond all controversy to be a mere ministerial duty, for the clerk of the county courts in Virginia and in this State were always authorized and directed by statute to perform this duty, which could only be done, if the duty was ministerial and not judicial; for if judicial, the power could not have been conferred constitutionally on a clerk. Yet it is obvious that the clerk is often called upon to decide or rather to make up his mind as to very nice questions of law in performing this ministerial duty; such for instance as to whether the certificate of the privy examination of a married woman or the certificate of the acknowledgment of a deed by the husband is substantially such a certificate as the statute-law requires, before the deed is entitled to be admitted to record. So it has been decided in Virginia, that a county court in passing upon any question under the old Code of Virginia of 1849, ch. 37 § 15, is vested with no judicial power, but acts in a capacity purely ministerial. And in determining, whether or not it will order the report of the surveyor, therein required, to be recorded, it is restricted to objection to said report, and has no right to look beyond the return of the list of sales by the sheriff required by section 11 of said chapter; and an error of the county court in refusing to order such a report to be rendered can not be corrected by writ of error or *supersedeas*, but only by *mandamus*. (*Delaney* v. *Goddin*, 12 Gratt. 266; *Randolph, Justice* v. *Stalnaker*, 13 Gratt. 523).

In the *Commonwealth of Virginia* v. *The Justices of Fairfax County Court*, 2 Va. Cas. 9, the General Court of Virginia, there being nine judges present, unanimously decided that a *mandamus* lies from a superior court of law to a county court to compel such county court to build a bridge or causeway according to the acts of assembly concerning public roads; (2 Rev. Code of 1819, ch. 236, sec. 9, p. 236). This act is: "When a bridge or causeway shall be necessary, and the surveyor and his assistants can not make or maintain the

same, the court of the county are empowered and required to contract for the building and repairing of such bridge or causeway, and to levy the charge therefor in their county levy." The court also held unanimously, that, though the county had returned to the *mandamus nisi* a denial that the particular bridge was necessary, or that the surveyor and assistants could make the said bridge, yet the truth of this return could be traversed, and, if it should be found untrue, the superior court of law would compel the building of such bridge by a peremptory writ of *mandamus*. White, judge, in delivering the unanimous opinion of the court in that case, says p. 12 : "To show that *mandamus* will not lie in such a case, it has been argued that the law does not require the court to build such bridge or causeway unless it be necessary, nor even then, unless the surveyor or his assistants can not make or maintain the same; that when called upon so to do, the court must necessarily inquire and determine upon the necessity of the bridge or causeway, and upon the capacity of the overseer and his assistants; and that this inquiry and decision imply a discretion in the court, and no *mandamus* lies to prescribe to an inferior body having judicial or discretionary powers the manner in which it shall exercise them; and in support of this proposition sundry authorities have been cited. (4 Bac. Ab. Mand. D. 507-8-9 ; Wilson's Ed. Comb, 422-478; 1 Black Rep. 667; 4 Burr 2290 ; 2 Stra. 1259 ; And. 24 ; 6 Mo. 229).

"But if this doctrine be true, to the extent contended for in this case, then there is an end to the remedy by *mandamus*. For not one can be imagined where a court, a corporation or an individual can be called upon on the happening of any event whatever to perform an act, in which the body or person called upon, has not the right to inquire whether the event has happened, and whether under the circumstances of the case he or it is bound to perform the act. But the cases relied upon do not support the doctrine even in an inferior court exercising judicial functions. There are authorities which show that if a party has ascertained his right to particular judgment, and the inferior court, through mistake or perverseness, will not render that judgment, but will evade it by granting a new trial, or other improper means, and

there is no other remedy, the party injured shall have his *mandamus*; for otherwise there would be a failure of justice. (1 Strang 113, 392; 4 Bac. Ab. 510, Wilson, Ed. and authorities there referred).

"But there is no pretence to judicial powers. The court is merely substituted, in a certain event, in the place of the overseer of the road, and the functions which it is required to perform in his stead, in the event of his incapacity, relate altogether to the police of the county, and are perfectly ministerial. They do not partake so much of the nature of judicial power as the admission of deeds to record, and yet a *mandamus* lies to compel a county court to do that. Now, there is not one of the cases, to which the court has been referred, which intimates that persons acting in the character of police or ministerial officers can not on account of their discretion be coerced to perform their duty.  *  *  *  *
If, then, the case does exist, and the court of the county refuses to execute the power without a lawful reason, on the mere pretext that they have a discretion to do as they like, it would seem pretty clear, that it could be coerced to do its duty by a *mandamus*, unless the law has furnished the public with some other specific remedy, which it is believed it has not."

This case was decided as long ago as 1815. There is no question, but that this decision would not be approved or followed in many of the States, and the reasoning, on which it is based, has not been followed in many of the States. In some, however, this reasoning apparently meets the approval of the courts; and, it seems to me, that this case has in its spirit and reasoning been followed to a considerable extent by the Virginia courts, and that it should in the general reasoning, upon which it is based, be followed by the courts of this State, though perhaps it should be somewhat modified. The distinction between judicial acts, the modes of performing which can never be enforced by *mandamus*, and ministerial acts, the performance of which as well as the mode of performing which may often though not always be enforced by *mandamus*, has often arisen in Virginia, because of the peculiar functions in Virginia of a county court. This is well pointed out in the case of *Dawson* v. *Thruston*, 2 H. & M, 135, in the opinion of Judge Tucker, who says:

"The county courts in Virginia act in a variety of characters and capacities. They are judges of all suits and controversies within their counties either in actions at common law or in suits in chancery or in controversies concerning wills, letters of administration, mills, roads &c. In causes at common law and in chancery there must be both a complainant and a defendant, before the court can have jurisdiction or do any act. In the cases of wills, letters of administration, mills &c. their jurisdiction commences upon an *ex parte* motion, and the person moving to controvert it makes himself a *voluntary* defendant. * * * * They act moreover as a board of police for the county and in this character have no forensic jurisdiction; as in laying the county levy, recommending sheriffs, coroners, militia officers and justices of the peace, in which they act merely as ministerial persons: and though they act in their several capacities on the same day, the character in which they act is determined by the nature of the case. * * * * * When a deed is offered to be proved, the court *quoad hoc* sits as a court of registry only. It is to examine the witnesses as to the *execution* of the deed, or receive the acknowledgment, if presented and affirmed to be acknowledged by the maker of it, *as a matter of right and duty.*"

Under sec. 24 of Art. VIII. of our present Constitution, as it has been amended, the judicial powers of the county courts have been much limited. They are no longer judges of suits and controversies between individuals either in actions at common law or in chancery. But they still possess certain judicial powers in controversies concerning wills, letters of administration, mills, roads &c. These, it has been decided, are judicial powers; and the performance of them in a particular manner cannot be enforced by *mandamus*. Thus the county court can not be enforced by *mandamus* to open a road. (*Jones* v. *The justices of Stafford*, 1 Leigh 584). Except that their judicial powers have been limited, our county courts under our amended Constitution possess the same or even greater variety of powers than they formerly did in Virginia. And hence it must often be inquired: What is the nature of a particular act done or refused to be done by them? Is such act judicial or ministerial in its nature? Upon the determination of these questions in these particular cases will

often depend the right of the circuit courts or of this Court to compel the performance of a specific act by the county court by the writ of *mandamus*.

In deciding such questions we should be governed largely, it seems to me, by the spirit, which has pervaded the courts of Virginia in the determination of the same questions. Perhaps we may regard it as proper to modify the decisions to a limited extent because of the changes in the character of the county courts; but it seems to me, that the Virginia cases and the spirit, which pervades them, are entitled in questions of this character to much more consideration than the decisions of any other State. It may be very difficult to draw any very clear line between the cases, in which particular acts might be required to be done by the county courts, and the performance of them enforced by *mandamus*, and the cases, in which writ of *mandamus* could not be issued to compel a county court to do a particular act; and I shall not in this even attempt to draw such a line, as I conceive, that however difficult it might be to draw this line with exactness, there can be no doubt, that in the present case a writ of *mandamus* can be issued requiring the county court to submit to the voters of Cabell county at the next general election the question, whether the county-seat of said county shall be moved from Barboursville to the city of Huntington.

It is true that in *Asberry* v. *Bennons*, 6 Tex. 457 (55 Am. Dec. 791) it was decided, that "when statute requires chief justice of county to order election for a seat of justice of the county, and prescribes that he shall canvass the returns in the manner prescribed by the laws regulating elections, such statute confides in him a personal trust distinct from his ordinary official duties, to be exercised according to the dictates of his own judgment; and so far as he acts in a judicial or deliberative capacity, his action cannot be controlled by *mandamus ;* and further that his decision is final and conclusive, as no mode for reversing his decision is provided, either by special statute or by any general law." One of the judges did not concur in these conclusions. The examination of the case will show, that by prior decisions in Texas apparently a different rule has been adopted from that to be deduced from the Virginia cases. Thus in *Commissioners,*

*&c.* v. *Smith*, 5 Tex. 471, it was held : "When the law pre-
scribes and defines the duty to be performed, with such pre-
cision and certainty as to leave nothing to the exercise of
discretion and judgment, the act is ministerial ; but when
the act to be done involves the exercise of discretion or judg-
ment, it is not to be deemed merely ministerial." We have
seen, that from the Virginia cases the prior conclusion is,
that whether the act be *ministerial* or *judicial* depends upon
the nature of the act and not simply upon whether it re-
quires the exercise of *judgment*; for there are very many acts
both legislative and executive, or ministerial, which require
the exercise of judgment, and sometimes of a very nice judg-
ment ; such a criterion can not be resorted to in order to dis-
tinguish *ministerial* and *judicial* acts.

But if this Texas decision be regarded as correct, which is,
I think, questionable, yet, I conceive, in this case before us
we can not hold otherwise than that the order, which
should have been entered by the county court of Cabell
directing a vote at the next general election to be taken on
the re-location of the county-seat of Cabell at the city of
Huntington, was one, which the court was required to make
not in its judicial but in the ministerial character, and in
which on the facts admitted in this case it had no discre-
tion of any sort. Nor was it required to exercise any
judgment whatever in making such order. It is true, that
at the prior stage of the proceedings it was required to
exercise a certain judgment, as to whether the petition pre-
sented to it was signed by the requisite number of voters
of Cabell county : But this judgment, which, it seems to me
could not be regarded as a *judicial* judgment had already been,
as the pleadings in this case admit, exercised by the county
court, and that court had decided, that the said petition was
signed by the requisite number of voters. Having so decided,
it seems to me clear beyond dispute, that nothing remained for
the court to do but to perform the clearly *ministerial* acts of per-
mitting this petition to be filed and ordering a vote to be
taken at the next general election as prayed for in the peti-
tion. It had no further judgment of any sort to exer-
cise.

The law, under which this proceeding was instituted is

section 15 of ch. 39 of the Code as amended by ch. 5 of Acts of 1881, (Warth's Code p. 255) as follows :

"Whenever the citizens of any county desire the re-location of their county-seat, they may file their petition for such re-location at a *place* therein, at any regular session of the county court in any year in which a general election is to be held in such county. But such a petition should not be filed at a session of said court within ninety days next preceding such election. None but legal voters of the county shall sign said petition, and an affidavit shall be appended thereto that the subscribers to said petition are, as the officers verily believe, legal voters of said county. Upon the filing of such petition signed by one fifth at least of all the legal voters of the county, to be estimated by allowing one vote for every six persons, as shown by the last preceding census, said court shall make an order that a vote be taken at the next general election to be held in said county upon the question of such re-location at the place named in said petition."

It is admitted by the pleadings in this case, that the peti-tion required by this act was signed by 807 legal voters of said county of Cabell with the affidavit required by law ap-pended, and that the signers of said petition exceeded one fifth of the legal voters of said county, when estimated, as required by the act, by allowing one vote for every six per-sons in said county, as shown by the last preceding census, taken in 1880. And this was adjudged to be the case, when the said petition was presented to the county court of Cabell, at a regular session thereof in the year 1886, in which year a general election is to be held in said county on the Tues-day after the first Monday in November of said year, and that said petition was offered to be filed at a spring-term of said county court, held more than sixty days before said general election. If these facts be all admitted by the pleadings, it seems clear that nothing but a ministerial duty remained to be performed by the court, which had nothing to do except simply to permit this petition to be filed and make an order that a vote be taken at the next general election upon the question of the re-location of the county-seat of Cabell at the city of Huntington, the place named in said petition. These acts required in fact the exercise of no judgment or discretion of

any sort—certainly no *judicial* discretion.   What were the excuses made by the respondents for the non-performance of what in its nature appears to be a ministerial duty requiring the exercise of neither discretion or judgment?

They first say that the petition was insufficient in law. The only objection to this petition on its face claimed is, that the prayer of it is not such as the statute requires.   The prayer is :   "That the court will make an order that a vote may be taken upon the question of re-location at and to the city of Huntington aforesaid at the next general election to be held in said county on the Tuesday next after the first Monday in November, 1886."   The statute requires that "the petition shall be for the re-location of the county-seat at a place named in the petition."   But the county court by said statute had no power to re-locate the county-seat, but only, in the words of the statute, "to make an order, that a vote be taken at the next general election to be held in said county upon the question of such re-location at the place named in the petition;" and the petition asked the court to make this order, which is all the court could do under this act.   The legislature rather loosely calls this a petition for the re-location of the county-seat, instead of describing it with more particularity by calling it a petition asking for the making of such order for a vote on the question of such re-location.   But the inaccuracy of the legislature in styling this petition "a petition for the re-location of the county-seat," does not render in the least degree obscure the character of the petition to be filed; and the petition admitted to have been offered for filing is exactly the petition, which this act prescribes.   It did not pray the county court to do, what it had no power to do ; nor did this act ever intend to prescribe, that such a vain and foolish thing should be inserted in such petition.

The second excuse of the respondents is, that there was no date to the petition and no proof, when it was signed, and therefore no proof, that, at the time it was signed, any of the parties, who signed it, were voters, though it was admitted, that they were all voters of the county, when the petition was presented to the county court.   The statute says:   "None but legal voters shall sign said petition," and "when the filing

of such petition signed by one fifth at least of all the legal voters of the county * * * said court shall make an order, &c." Now it seems to be perfectly clear, that, if any person signed such petition, and his name remained on the petition, till it was presented to the county court by his counsel, when it was so presented, he would be regarded as ratifying and approving his signature to the petition; and if there were a sufficient number so ratifying and approving their signatures, who were proven to the satisfaction of the court to be then legal voters of the county, to amount to one fifth of the voters of the county estimated in the manner prescribed, this is all that the law requires. And this the respondents admit was the fact. It would be idle to inquire, whether the parties were legal voters of the county, when they signed the petition; for it would be immaterial, whether they were or not. If any of them have ceased to be legal voters, when the petition was presented, those names certainly could not be counted to make up the required one fifth of the legal voters of the county signing the petition. This objection like the first is based on what seems to me an obvious perversion of the plain meaning of this statute.

The third objection made by the respondents to the issuing of this peremptory writ of *mandamus* asked is, that the refusal to allow said petition to be filed was a *judicial* act, which can only be reviewed by writ of *certiorari*. Now it having been shown, that the petition offered was in the form prescribed by the statute and had attached to it the affidavit required by the statute in its exact words, and it being admitted by the respondents, that it was signed by the requisite number of legal voters of Cabell county, there remained no judgment or discretion of any sort in the court; its clear and imperative duty under the statute was to permit this petition to be filed and to make the order prayed for therein. If any inquiry had been made as to whether the signers were legal voters of the county, it seems to me, though this would have required judgment and discretion, yet it would not have converted a matter clearly ministerial in its character into a judicial act, simply because the performance of such ministerial act required the exercise of judgment. Such is the spirit of the Virginia laws. But even if they were to be dis-

regarded, it would in this case make no difference, because the respondents admit, that the requisite number of legal voters signed the petition, and this really was the only inquiry of any sort they had to make; all their other duties were clearly ministerial requiring and permitting the exercises of no judgment or discretion of any sort.

The fourth and last objection urged by the respondents as a reason, why the peremptory writ of *mandamus* asked should not be awarded it, that the statute requires the place, where it is proposed to re-locate the county-seat, to be named in the petition and order of the county court directing a vote on the subject of re-location to be taken at the next general election, and that the place named in this petition is the city of Huntington, which, the respondents say, covers about twelve square miles, so that in fact there is no place within the true meaning of this statute named in this petition as the proposed county-seat; as under the vague name of the city of Huntington, the proposed location of the county-seat might be in one place or in another place some three or four miles off but still in the limits of the city of Huntington. Now it does seem to me very clear, that by the requirements, that the place, at which it was proposed to re-locate the county-seat, should be named, was meant the town or city, in which it was proposed to locate the county-seat, and not any particular place within such town or city; and that this exact locating of the site of the court-house, jail and other public buildings within the limits of the town selected as the county-seat must necessarily be left to the determination of the county court, after the town, which was to be the county-seat, has been selected by a vote of the people. It would seem clear, that there could not be a selection by the petitioners of the exact location of each of the public buildings and an insertion of this exact location in the order directing a vote to be taken on the re-location of the county-seat; for how could the petitioners in the county have known in advance what particular locality in the proposed county-seat they would be able to get, on which to build the court-house, jail and other buildings? But if there could be any doubt on this question, it is settled by the fact that under our statutes the county court may at its pleasure change the location of the court-house,

jail or other public buildings at the county-seat to any point, that they may think proper, at any time, so that the same be at the county-seat, purchasing or providing at their pleasure new and other buildings whenever they may think proper, provided only such buildings be located at the county-seat, that is, the town chosen as the county-seat. (Acts of 1885, ch. 24.) Now it would be absurd in the extreme to require the petitioners to name the locality within the limits of the city of Huntington, where they proposed that the court-house should be built, if the county court of Cabell under this act of 1885, ch. 24 had a perfect right, at any time to change the location of the court-house to any point within the limits of Huntington. The fact that Huntington is so large and so thinly populated, and the place where the court-house may be built is therefore left to a certain extent doubtful, may be a good reason, why the voters should not vote for a re-location of the county-seat at the city of Huntington, but it is no reason why we should not issue the peremptory writ of *mandamus* asked for by the petitioners requiring the county court of Cabell county to perform a plain ministerial duty.

PEREMPTORY MANDAMUS ISSUED.

# WHEELING.

