# CHARLESTON.

STATE *ex rel.* G. H. MARCUM *et als.* v. COUNTY COURT OF WAYNE COUNTY *et als.*

Submitted January 12, 1922.    Decided January 24, 1922.

1.  COUNTIES—*Statute Requiring Two-Fifths of Legal Voters to Sign Petition for County Seat Election Held Unrepealed and Unmodified, Notwithstanding Franchise to Women.*

    Notwithstanding the great increase in the voting population of the several counties in this State, occasioned by extension of the elective franchise to women, in consequence of which one-sixth of the entire population does not approximate the number of citizens entitled to vote, the provision of sec. 15 of ch. 39 of the Code, requiring a county court to submit to the voters the question of relocation of a county seat, upon the filing of a petition for such action, signed by two-fifths of the legal voters of the county, to be estimated by allowing one vote for every six persons in such county, as shown by the last preceding census, and verified in the manner therein prescribed, remains unrepealed and unmodified. (p. 108).

2.  SAME—*Statute as to Petition for County Seat Election Not Repealed by Implication.*

    The basis provided by the statute for ascertainment of the total number of legal voters, for its purpose, is purely arbitrary and has always been so, and there is nothing in the Constitution or the nature of the subject that can be invoked in support of the theory of an implied repeal or modification of

90 W. Va.

the statute, upon the ground of legislative necessity, if legislation upon the subject could arise in such manner.  (p. 108).

3.    STATUTES—*No Implied Repeal or Modification from Unexpressed Legislative Intent.*

An implied repeal or modification of a statute  cannot arise out of supposed legislative intent in no way expressed, however necessary or proper it may seem to be.  (p. 109).

4.    COUNTIES—*"Legal Voter" Not Appearing on Registration May Sign Petition for County Seat Election.*

Upon an inquiry as to the sufficiency of the number of legal voters signing such a petition, a county court cannot rightfully eliminate from its count of the signatures, the names of persons signing the petition but not appearing on the registration books of the county, the statutory method of fixing the number being exclusive and registration not being essential to the right of petition conferred by the statute.  (p. 110).

5.    SAME—*Signatures to Petition for County Seat Election Need Not be in Petitioners' Handwriting.*

Nor can names be eliminated from such count because the signatures are not in the handwriting of the petitioners, neither the statute nor anything in the nature or purpose of the signature requiring it to be in the handwriting of the petitioner.   The signature of a voter written on such a petition by another, in his presence and by his direction, is valid and sufficient.  (p. 111).

6.    SAME—*Married Woman May Use Husband's Name to Petition for County Seat Election with Prefix "Mrs."; Prefix "Mr." to Signature of Male Voter Does not Vitiate.*

A married woman who is a legal voter may sign such a petition by the use of the name of her husband with the abbreviated title "Mrs." prefixed to it; and the abbreviated title, "Mr." prefixed to the signature of a male voter, to such a petition, does not vitiate it.  (p. 112).

7.    SAME—*Separate Affidavits Verifying Petitions for  County Seat Election Held Sufficient.*

If the sections or parts of a petition, or several petitions, for such purpose, circulated by a number of persons, in their respective neighborhoods, and signed by enough voters to constitute the required number, when combined, are all separately and respectively verified by the persons who obtained the signatures, in the prescribed manner, the verification is

90 W. Va.

sufficient, and it is not necessary to have a single affidavit saying all the persons whose names are found on the parts or petitions are legal voters.  (p. 113).

8.  SAME—*Motives of Petitioners for County Seat Election Furnishes no Ground for Refusal Thereof.*

A county court cannot refuse to grant the prayer of such a petition, upon the theory that voters, in signing it, were actuated by improper motives.    Its jurisdiction is limited to inquiry as to compliance with conditions expressly imposed by the statute and execution of its mandate.  (p. 114).

Application by the State, on the relation of G. H. Marcum and others, for writ of mandamus against the County Court of Wayne County and others.

*Peremptory writ awarded.*

*Wm. T. Lovins* and *Douglas W. Brown,* for relators.
*J. S. Marcum, J. H. Meek,* and *Chas. W. Ferguson,* for respondents.

POFFENBARGER, PRESIDENT:

The relators in this proceeding seek a peremptory writ of mandamus to compel the County Court of Wayne County to order an election, upon what is claimed to be a sufficient petition, to ascertain in the statutory manner, the will of the voters of that county, on the question of relocation of its county seat or removal thereof from the town of Wayne to the City of Kenova.    The return of the County Court and the members thereof to the alternative writ awarded endeavors to justify refusal to call such an election and dismissal of the petition, upon the ground of insufficiency of the number of legal voters uniting in the petition and uncertainty as to the number of voters among the more than six thousand persons whose names appear in the petition.

Construction of a certain clause of the statute providing for such an election, sec. 15, ch. 39 of the Code, seems to be the most important issue involved.    It requires a petition to be filed by two-fifths of all the legal voters of the county, to be estimated by allowing one vote for every six persons in it, as shown by the last preceding census.    Extension of the

elective franchise to the women of the state, since that statute was passed, has no doubt doubled the voting population of each county. Nevertheless, the statutory basis of ascertainment of the number of legal voters, for the purposes of such a petition, has not been altered. Adherence to the principle of the provision would now require such a petition to be signed by two-fifths of two-sixths, or one-third, of the population as shown by the last preceding census. In view of the manifest inaccuracy of the statutory method of ascertaining the voting population of a county, under present conditions, it is insisted that this provision of the statute has been impliedly repealed or modified by the constitutional and statutory extension of the elective franchise to the women; and that only the portion of the clause, which requires the signatures of two-fifths of all the legal voters can be deemed now to be in force.

Lack of intent on the part of the Legislature to require even an approximation of the actual number of voters to be ascertained for such purpose and the adoption of a purely arbitrary standard or basis for the determination of the number of signatures, are clearly manifest. Under the statute, such an election may be held in the tenth year after a census has been taken, and, although within the more than nine years, the voting population of a county may have doubled or trebled, the basis is one-sixth of the population as shown by that census. In many of the mining and industrial sections of this state, the population has no doubt doubled within such period, and yet the legislature, presumptively cognizant of such results, has not seen fit to make any alteration in the basis of the petition. Moreover, in view of the wisdom which the courts attribute to legislatures, such results must be deemed to have been foreseen by that body. It may be safely asserted, therefore, that nothing more than a purely arbitrary basis was intended. If the purpose was to require the petition to be signed by two-fifths of all the voters in the county, a different method of ascertaining the number would have been adopted, for it must have been perfectly manifest that one-sixth of the population as shown by the last preceding census would not always even

approximate the total number in a growing state.    Prior
to the amendment of the statute made by ch. 37 of the Acts of
1891, so as to require the petition to be signed by two-fifths
of the voters, the legislative policy respecting the require-
ment for the allowance of such an election, was much more
liberal than it is now.    From 1872 until 1891, the signa-
tures of only one-fifth of the voters were required and the
voting population was indicated in the manner now pro-
vided, namely, by division of the entire population, as shown
by the last preceding census, by six.

Nothing in the nature of such an election raises the high
degree of legislative solicitude respecting the relative num-
ber of petitioners, assumed in the argument for implied re-
peal or modification of the statute.    The calling of such an
election is a legislative function in the exercise of which the
law making body, for convenience and precaution against
error makes use of the county court, as an administrative
agency, limiting its action by a requirement of initiation by
a minority of the voters and final determination by the will of
all, expressed by a three-fifths vote of those participating.
*Baker* v. *O'Brien,* 79 W. Va.   101, 104.    Nor is the legis-
lative power limited or restrained by anything in the con-
stitution.    Not a word in the organic law forbids authori-
zation of county courts to call such elections upon their own
motions and without any petition.    The only reference to
the subject found in it is the inhibition of location or reloca-
tion by special acts.    Con. Art. VI, sec. 39.    Limitation of
the authority of county courts respecting such elections and
the bestowal of initiative power upon voters rest upon noth-
ing more than sound legislative discretion.    Location and re-
location of a county seat are conditional legislative grants or
acts made effective upon compliance with annexed conditions,
by the voters and the county court.    *Morris* v. *Taylor,* 70
W. Va. 618; *State* v. *Harden,* 62 W. Va. 313, 363.

Finding nothing in legislative policy nor in the constitu-
tion, to sustain the view that repeal or modification of the
provision in question must have been intended, upon the
ground of legislative necessity, we inquire whether any terms
are found in the act extending the elective franchise to the

women, or elsewhere, indicative of intention to effect such repeal or modification. A careful search reveals none and it is not claimed that there are any. Nothing is invoked in support of such intention, except the silence of the legislature respecting repeal or modification, and the great increase in the number of voters. In these circumstances, we find no evidence of it. If the legislature had dealt with the subject, it might have deemed one-fifth of the number of voters sufficient under present conditions. We are not at liberty to speculate as to what that body might have done or probably would have done, if it had seen fit to legislate upon the subject. On the other hand, its silence signifies acquiescence in the provision and satisfaction therewith. The arrangement does not now require the signatures of two-fifths of all the voters. It did not do so under prior conditions. There is an inconsistency in the requirement of the signatures of two-fifths of the voters and ascertainment of the total number, by taking one-sixth of the population as given by the last census. As has been shown, there was such inconsistency before the elective franchise was extended to the women. Hence, there is nothing in this circumstance, strongly arguing intent to repeal or modify. Unexpressed intention does not suffice.

As disclosed by the census taken in the year 1920, the population of Wayne County was then 26,012. One-sixth of that number is 4,335. Taking two-fifths of it, as the number required for the purposes of the petition, we have 1,734. On the petition filed, there are 6,136 signatures. Of these, 1,319 were eliminated because the names did not appear on the registration books, 5, because the parties represented by them were held to be minors, 6, because the parties represented by them were treated as non-residents, 29, because they were duplications, 407, because the abbreviated titles, "Mr." and "Mrs.", were prefixed to the names, and 3,186, because the signatures were not in the handwriting of the signers. These eliminations, if sustained, would reduce the number to 1,184. Rejection of the contention that the statute must be deemed to have been partially repealed or modified, makes it apparent that the 1,319 names cannot be rejected upon the

ground of non-registration.    The number of signatures required is determined under the statute, by the scheme or plan prescribed by it, not by the actual number of voters. Hence, it is obvious, that the county court, in its determination of the number of signatures required, had no right to consider the registration list, nor to test or limit the right of petition by it.

The terms ''legal voters,'' used in the statute include all who have the right to be registered to vote.    Registration does not determine the status of the citizen, respecting the right of franchise.    It is a mere limitation on the exercise of such right vested in certain portions of the citizens of the state by the constitution.    A legal voter may be barred of the right to vote at a particular election, because of lack of registration, but he is a legal voter, nevertheless, because, by compliance with certain conditions, he may vote in any election.    Exclusion from participation in a given election by reason of non-registration, no more affects the status of a legal voter, within the meaning of the law, than exclusion therefrom by sickness, absence or other accidents.    Registration does not confer the right.    It merely regulates the exercise thereof.    Non-registration does not destroy the status conferred by the constitution and statutes.

Restoration of the 1,319 names struck off, for non-registration, decreases the number eliminated to 3,633 which, deducted from the total number on the petition, leaves 2,503, or 769 more than are necessary. Though it seems unnecessary to carry the inquiry as to the number of signatures further, it is proper to say there was no justification for the rejection of the 3,186 names, because they were not in the handwriting of the petitioners.    In the absence of any legal regulation forbidding it, any person whose name is to be signed to an instrument may cause his signature to be affixed by his agent, or, if he is an officer, by his deputy. Code, ch. 13, sec. 16. This statute seems to be merely declaratory of the common law.    *Gardner* v. *Gardner*, 5 Cush. (Mass.) 483 ; Wood, St. Frauds, sec. 16 ; Brown, St. Frauds, secs. 10, 12.    The testimony of about a dozen of the sixty different persons  who circulated the petition and obtained signatures thereto, was

taken in an effort to prove defectiveness in the signatures and other grounds of rejection. From this testimony, it appears that, in many instances, the husband signed his own name and those of his wife and children having or claiming the right to vote and to be of voting age, in the presence of the wife and children, or that the wife or a child signed the names of all the voters of the family, in their presence. In other instances, the persons circulating the petition signed the names in the presence of the voters and by their direction. In some cases, names of persons were put on, in their absence, the wife signing the husband's name, he being away at work, or a mother or father signing the name of a son or daughter, for the same reason. In all those instances in which the name of a voter was put on by another in his presence, the signing was manifestly sufficient and valid.

It is unnecessary to determine whether as much can be predicated of names put on in the absence of the signers; for it is perfectly safe to say that at least one-half of the 3,186 signatures rejected upon the ground of identity of handwriting, were validly affixed.

If a statute requires the signature to be in the handwriting of the person signing, or, if it is required for a purpose manifestly intended to be accomplished by the use of the handwriting of the person signing, such as identification of a paper, the signing cannot be delegated. *Kirkpatrick* v. *Deegans,* 53 W. Va., 275. The signatures to the petition now under consideration are not required for identification of the paper, nor for any other function that cannot be accomplished otherwise than by the use of the handwriting of the petitioner. The sole purpose of the signatures is to show that the requisite number of voters desire submission of the question of relocation of the county seat. The signature, therefore, performs only its ordinary function, expression of the intention, will and desire of the signer.

Nor can the striking off of 407 names because titles were prefixed, be justified. In law, a name is only a means of identification of a person, and a descriptive prefix or title clearly does not vitiate it. As the name is only matter of identification, a married woman may use in her signature, as

her christian name, some or all of her maiden name, or describe herself by the use of her husband's name with the prefix Mistress. The liberality of the common law rule on this subject is indicated by the following text well sustained by authority; "Where a signature is by mark, the mark itself made by the person whose signature it is to become, and not the name written by another near it, is the signature. And the validity of the signature is not affected by the fact that the name is written by the other party to the contract. Nor is it affected, in the absence of a statute-requiring a name to accompany the mark, by the fact that no name accompanies it; nor by the fact that a wrong name is written near the mark; nor by the fact that words indicating that it is intended as a mark are omitted." 36 Cyc. 453, 454.

The effort to disprove eligibility of the signers resulted in egregious failure. About sixty different persons circulated the petition, in their respective neighborhoods, and, in that way, obtained the signatures. The affidavit of each one of these persons, to the effect that he verily believes each and all of the persons whose names are signed to it are legal voters of the county, is appended to the petition he circulated. Each one of these affidavits was made in strict conformity with the statute, and by a person who, presumptively, was qualified to make it. The petitioners were his neighbors. Though no one of them is broad enough to include all the names upon all the copies of the petition that were circulated, the several copies circulated and verified by different people may be treated as constituting one petition. They are parts of one whole, and each part having been verified, the whole was verified. If the affidavit made by J. G. Lambert, to include all the names on all of the petitions, can be regarded as having been successfully impeached, by his admission of lack of personal knowledge of the status of a great many of the signers, respecting their right to vote, the other affidavits made to separate parts of the petition, or to the more than sixty petitions, if they must be treated as separate, amply suffice. No attack is made on any of them except one, and the petition to which it is appended represents exactly fifty names. The statute authorizes the filing

of more than one petition for submission of the same ques·
tion.   It mentions but one affidavit, but, immediately after-
ward, it speaks of the filing of the "petition or petitions."
It would be extremely technical, as well as unreasonable, to
hold that, in addition to an affidavit verifying each one of
the many petitions, there must be one single affidavit cover-
ing all of them.   It would be unreasonable, because there
might be instances in which no one individual could con-
veniently make such an affidavit.   No intent to burden the
petitioners unduly and to no purpose can be justly imputed
to the Legislature.   The petitions so verified made out a
*prima facie* case.   *Mann* v. *County Court*, 58 W. Va. 651.
To escape its effect, it was incumbent upon the remonstrants
to overthrow it, and they have not done so.

From the conclusions already stated, it is manifest that
there is neither uncertainty nor fraud in the petitions. There
is no authority in the court to inquire as to the motives that
induced the signing thereof.   In laying down the basis of
the petition, the statute necessarily limits the jurisdiction of
the court, upon the inquiry as to its sufficiency, to the as-
certainment of the requisite number of legal voters.     If
the Legislature had intended to preclude the right of peti-
tion on the ground of bad motives, it would have said so.
The adverse results of a previous election held on the same
question and the subsequent destruction of the court house by
fire, do not forbid the filing of a new petition.   Such ad-
vantage as the destruction of the court house may give the
proponents of the new election, or as they may suppose it
will give them, does not affect their status in the least.·   If
the effort to obtain that advantage could be deemed to be un-
fair or unneighborly, the county court cannot refuse the
prayer of the petition on that ground.

The petition being amply sufficient and objection to the
calling of the election having been founded upon nothing
but alleged insufficiency thereof, the peremptory writ moved
for will be awarded.

                                    *Peremptory writ awarded.*