128 S.E.2d 185 (1962)
STATE of West Virginia ex rel. PLYMALE et al.
v.
George L. GARNER et al., etc., of City of Huntington, etc.
No. 12189.
Supreme Court of Appeals of West Virginia.
Submitted September 12, 1962.
Decided September 25, 1962.
Opinion Filed October 30, 1962.
Dissenting Opinion November 19, 1962.
*186 Beckett & Burford, Robert H. Burford, Huntington, for relators.
Maxwell W. Flesher, Selden S. McNeer, Huntington, for respondents.
BERRY, Judge.
This is an original proceeding in mandamus instituted in this Court by the petitioners, J. Fred Plymale, E. E. Sturm, Harry Yoho, A. M. Van Hoose, Howard L. Bailey and Oliver W. Spurlock, citizens, residents, qualified voters and electors of the City of Huntington, Cabell County, West Virginia, against the respondents, George L. Garner, Bert H. Early, Bob E. Myers, A. E. Harris, John J. Durkin, W. R. Moser and Harry S. Damron, members of the Municipal Council of the City of Huntington, and Florence Williams, City Clerk of said City.
Upon application to this Court, a rule in mandamus was granted requiring the respondents to show cause why a writ of mandamus should not be awarded against them requiring them to submit to the voters of the City of Huntington at the general election to be held on November 6, 1962, the question: "Shall a charter be framed by representatives of the voters?" The rule was returnable September 5, 1962, but upon request of the parties a continuance was granted until September 11, 1962, and the case was submitted to this Court for decision on arguments and briefs. By order entered September 25, 1962, this Court held that the petitioners herein were entitled to a writ of mandamus as prayed for and awarded such writ. This opinion has been prepared and filed for the purpose of stating the reasons for the Court's awarding of the writ as prayed for by the petitioners.
A joint and several demurrer and an answer of all the respondents except Bert H. Early were filed to the petition in mandamus and the separate demurrer and the answer of Bert H. Early, with exhibits filed in addition thereto, were filed by Early to the said petition. A stipulation of facts was filed and made a part of the record.
On July 9, 1962, the petitioners in this proceeding filed a petition with the Council of the City of Huntington, the respondents herein, purporting to bear the signatures of 15,572 voters of said city, requesting that the council provide by ordinance for submission to the voters at the general election to be held on November 6, 1962, the question: "Shall a charter be framed by representatives of the voters?", under the provisions of Code, 8A-2-2, as amended.
On June 25, 1962, the Council of the City of Huntington adopted two ordinances, the first establishing a fee for refuse removal and the second a fee for fire protection, in accordance with the provisions of Code, 8-4-20, as amended. These fees were to *187 become effective July 1, 1962, and were adopted for the purpose of producing over one-half million dollars in additional revenue for the city. On July 7, 1962, two petitions were filed with the Clerk of the City of Huntington protesting each of the fee ordinances under the provisions of Code, 8-4-20, as amended. Most of the relators in this present proceeding participated in and obtained the petitions protesting the ordinances for the refuse removal and fire protection fees.
Under the provisions of Code, 8-4-20, as amended, which was rewritten by the legislature after Chapter 8A was placed in the code, if thirty percent of the registered voters of the city, by written petition duly filed by them, protest against such ordinances they shall not become effective until they shall be ratified by a majority of the votes cast at a municipal election. The petition protesting the fire fee ordinance purported to contain the names of 17,842 voters and the petition protesting the refuse removal ordinance purported to contain the signatures of 18,524 voters. The City of Huntington has 46,159 registered voters.
Upon the receipt of the three petitions mentioned above they were examined by members of the City Council and it appeared that a number of the petitioners had signed the same petition more than once; that signatures of different petitioners had been signed by one person; that many of the petitioners gave addresses which were outside the City of Huntington and, in several instances, even in adjoining states; and that some of the petitioners were minors or not qualified voters. The council thereupon directed the clerk to examine the petitions to determine their sufficiency. A systematic procedure was initiated by the council involving the identification of each petitioner and the indexing in alphabetical order of each name on each petition. After identification and indexing the signatures on each petition were to be checked for duplications and, through the use of voter registration books, the validity of the signatures, current voter registration of the signers and other voter qualifications were to be determined.
The clerk adopted the procedure outlined above and on July 10, 1962, at the direction of the council began a process of checking the petitions protesting the refuse and fire fee ordinances because they were filed prior to the charter election petition. Four regular employees of the city were assigned full-time to this task and five additional full-time clerical workers were obtained for such work. At the time the stipulation of facts was filed in this case, which was September 11, 1962, about 4500 names had been checked on each of the petitions pertaining to the refuse and fire protection fees and about 1500 had been found or declared invalid on each. Only 458 signatures had been examined on the charter petition at that time, 112 of which were declared valid, 129 of which were declared invalid, and 217 of which had not been thoroughly checked for validity.
No formal challenge to the petition in question in this proceeding was made and neither the clerk nor the council had declared the petition valid or invalid at the time of the hearing in this Court, and the council had not taken any steps to adopt an ordinance for an election on the question: "Shall a charter be framed by representatives of the voters?" As heretofore stated the next general election will be held in the City of Huntington on November 6, 1962. No other general election will be held until November 5, 1964, and the next regular municipal election will be held in the City of Huntington on the first Tuesday in June, 1965. Huntington is a Class I City.
This entire proceeding turns on the provisions of Code, 8A-2-2, as amended, which reads as follows:
"The governing body of a city may provide by ordinance for the submission to the voters of the city at any general election or at a regular or a special municipal election of the question, `Shall a charter be framed by representatives of the voters?': Provided, however, *188 that the governing body of a city may not, without the petition of the voters, as hereinafter set forth, submit the same question to the voters more than once in any two year period after the effective date of this act.
"The governing body of a city shall, upon petition bearing the signatures, written in their own handwriting, of voters of the city equal in number to fifteen per centum, if a class I or class II city, and ten per centum, if a class III city, of the total registration of voters therein, or if there be no registration of voters then a like per centum of duly qualified voters for the last preceding general election, provide by ordinance for the submission to the voters of the city at any general election or at a regular municipal election of the question, `Shall a charter be framed by representatives of the voters?'
"The governing body of a city shall provide by ordinance for a special election on said question if a petition bearing the signatures in their own handwriting of voters of the city equal in number to fifteen per centum if a class I or class II city, and ten per centum if a class III city, of the total registration of voters therein, or if there be no registration of voters then a like per centum of duly qualified voters for the last preceding general election, expressly requesting that a special election be called for the purpose, be presented to the governing body more than one hundred twenty days prior to the date of the next regular municipal election.
"Any special election under this section shall be held not less than thirty nor more than sixty days after the ordinance shall have been adopted, or the petition shall have been presented to the governing body."
This statute provides for charters of municipalities and is designed to effectuate the Home Rule Amendment to the Constitution of West Virginia, Article VI, Section 39(a), adopted by the voters of this state in 1936, which reads as follows:
"No local or special law shall hereafter be passed incorporating cities, towns or villages, or amending their charters. The legislature shall provide by general laws for the incorporation and government of cities, towns and villages and shall classify such municipal corporations, upon the basis of population, into not less than two nor more than five classes. Such general laws shall restrict the powers of such cities, towns and villages to borrow money and contract debts, and shall limit the rate of taxes for municipal purposes, in accordance with section one, article ten of the Constitution of the State of West Virginia. Under such general laws, the electors of each municipal corporation, wherein the population exceeds two thousand, shall have power and authority to frame, adopt and amend the charter of such corporation, or to amend an existing charter thereof, and through its legally constituted authority, may pass all laws and ordinances relating to its municipal affairs: Provided, that any such charter or amendment thereto, and any such law or ordinance so adopted, shall be invalid and void if inconsistent or in conflict with this Constitution or the general laws of the State then in effect, or thereafter, from time to time enacted."
The statute, Code, 8A-2-2, above quoted, was enacted by the legislature in 1937 and amended by the legislature in 1947. The amendment in 1947 added to the second paragraph the submission of such question to the voters of any municipality governed by a Home Rule Charter "at any general election". The original statute only provided for such questions to be submitted to the voters, upon petition thereof, at the next regular municipal election or at a special election if so requested.
*189 It is the contention of the respondents that under the statute in question they have the right to select the election at which the question shall be submitted to the voters of the city because the second paragraph of the statute provides that when a proper petition is filed with the council said council shall provide by ordinance for the submission to the voters of the city at any general election or at a regular municipal election such question. This position is not well taken because under this interpretation an election could be postponed by the council for a period of many years. If it had the right to select any general election or a special election it could select one at any time it saw fit. In the case at bar if such election on the question presented by the petition is not held at the next general election, on November 6, 1962, which will be about four months from the time the petition was filed, a period of two years would elapse before another general election would be held and a period of almost three years would elapse before another municipal election would be held. Under any reasonable interpretation this would be too long a delay to submit such a question if a proper petition is submitted to the council for such question to be voted upon by the voters of the city. Before the legislature rewrote this statute in 1947 it only provided for such question to be submitted to the voters at the next regular municipal election. When it was rewritten the legislature inserted the words "at any general election" before "or at a regular municipal election". This, by necessity, was put in the place of "at the next regular municipal election". The only logical interpretation of the amended statute would be that the election should be held at any general election or regular municipal election occurring next after the petition had been filed with the council if there was a reasonable interval between the filing of the petition and the election.
This interpretation is clearly supported by the first paragraph of the statute, which provides for the governing body to submit such question by an ordinance, but it prohibits the governing body from submitting the same question to the voters more than once in any two-year period without a petition of the voters.
It is true that a valid petition bearing the signatures of voters in their own handwriting equal to fifteen percent of the total registration of voters of the city, or 6,923 voters in the case at bar, must be filed with the city council before any such election can be held and the city council or the clerk has the right and duty to check such petition to determine its sufficiency. However, the determination of the validity of the petition must be made within the prescribed time and if no specific time is set out in the statute then, in any event, within a reasonable time. McQuillin on Municipal Corporations, 3rd Ed., Vol. 5, § 16.65; Hindman v. Boyd, 42 Wash. 17, 84 P. 609. Under the facts and circumstances in the case at bar the respondents have not acted within a reasonable time to determine the validity of the petition. In fact, they have not acted at all in connection with this matter because their answer, which was filed about two months after the filing of the petition with the council, neither affirms nor denies its validity but contends that they have the right to check each name systematically regardless of how long it would take to do so. The statute in question, Code, 8A-2-2, as amended, contains language to indicate what a reasonable time would be in the case at bar. The third paragraph thereof provides for a special election if a valid petition so requests and is presented to the council more than one hundred twenty days prior to the next regular municipal election. The last paragraph of said statute requires that such special election be held not less than thirty nor more than sixty days after the petition has been presented to the council. The time reference after the ordinance has been adopted refers to the first paragraph of the statute wherein the governing body itself provides by ordinance for submission of such question to the voters of the city.
*190 Where the council either refuses to adopt the ordinance or submit it to a vote in a somewhat similar situation dealing with initiative and referendum questions mandamus will lie to compel the council to submit the proposed ordinance to a vote at a general election. Bachmann v. Goodwin, 121 W.Va. 303, 3 S.E.2d 532. It has been held that an ex parte proceeding by a city clerk conducted to determine the validity of a petition where as a result said petition was declared invalid by the clerk because some of the signatures were not genuine did not authorize the rejection of the entire petition by the clerk. State ex rel. Noyes v. Lane, 89 W.Va. 744, 110 S.E. 180. This Court has also held that insufficient funds of a city to hold a special election in such cases is no excuse for not holding the election. State ex rel. Peterkin v. City Council of City of Parkersburg, 95 W.Va. 502, 121 S.E. 489. In any event when the proceeding in this case was instituted in this Court it brought all the parties before it with the issues to be determined by the Court and not the parties. In other words, the question of the validity of the petition should have been raised and settled in this proceeding, but the respondents took the position that they could still ascertain the validity or invalidity of the petition, take as long as they desired, and hold the election whenever they wanted to if the petition was found to be valid. Evidence could have been taken on the validity of the petition when this proceeding was instituted in this Court if the question of validity had been properly raised here. Hindman v. Boyd, 42 Wash. 17, 84 P. 609; State ex rel. Kahle v. Rupert, 99 Ohio 17, 122 N.E. 39. However, this procedure was waived by the respondents in their answer wherein they neither admitted nor denied the validity of the petition and left the question unsettled in the stipulation of facts filed with the Court. The petition in question then was presumed to be valid and the writ was issued for the holding of the election on the question with regard to the charter. McQuillin on Municipal Corporations, 3rd Ed., Vol. 5, Signatures, § 16.61; Woodward v. Barbur, 59 Or. 70, 116 P. 101; State ex rel. Kemper v. Carter, 257 Mo. 52, 165 S.W. 773; In re Initiative Petition No. 260, State Question No. 377, Kirk v. Anderson (Okl.), 298 P.2d 753. Those who are charged with the duty of passing or acting on the validity of the signatures on a petition such as the one at bar are subject to judicial control. 28 Am.Jur., Initiative, Referendum and Recall, § 37. Mandamus is a proper remedy to require elections in such cases. 28 Am.Jur., Initiative, Referendum and Recall, § 40; State ex rel. Wells v. City of Charleston, 92 W. Va. 61, 114 S.E. 382; Blotter v. Farrell, 42 Cal.2d 804, 270 P.2d 481.
For the reasons stated herein the writ of mandamus prayed for by the petitioners was granted.
Writ granted.
CALHOUN, President (dissenting).
Believing that the majority opinion is premised on certain unwarranted conclusions, both legal and factual, and that the holding therein set out is both legally unsound and wrong in principle, I respectfully dissent.
At the outset we must bear in mind that the burden of proof is upon the relators. "Applicant for mandamus has the burden of proving all facts necessary to authorize its issuance." 55 C.J.S. Mandamus § 325b, page 559. That burden, as defined by this Court, is a rather onerous one. In innumerable prior cases this Court has held that a writ of mandamus will be issued only upon a showing that the relator has "a clear legal right" to the relief sought. Two of the recent cases to this effect are State ex rel. Neal v. Barron, Governor, W.Va., pt. 3 syl., 120 S.E.2d 702, and State ex rel. Evans v. Kennedy, 145 W.Va. 208, pt. 4 syl., 115 S.E.2d 73. This Court has stated that such clear legal right "cannot be established in the proceeding itself, but must exist when *191 the proceeding is instituted." State ex rel. Jarrell v. Walker, 145 W.Va. 815, pt. 2 syl., 117 S.E.2d 509.
"The extraordinary writ of mandamus will never be issued in any case where it is unnecessary, or where, if issued, it would prove unavailing, fruitless, and nugatory. The court will not compel the doing of a vain thing. * * *" Hall v. Staunton, 55 W.Va. 684, syl., 47 S.E. 265; Gerwig v. B. & O. R. Co., 141 W.Va. 139, syl., 89 S.E. 2d 217; Brannon v. Perkey, 127 W.Va. 103, 111, 31 S.E.2d 898, 902, 158 A.L.R. 631; State ex rel. McLaughlin v. Morris, 128 W.Va. 456, 459, 37 S.E.2d 85, 87. A writ of mandamus will never be granted "where, if issued, it would prove fruitless and unavailing." Taylor v. Board of Canvassers of Mineral Co., 119 W.Va. 378, pt. 4 syl., 193 S.E. 575; Cantrell v. Board of Education, 107 W.Va. 362, syl., 148 S.E. 320; State ex rel. Pardue v. County Court, 105 W.Va. 235, pt. 1 syl., 141 S.E. 874; W. Va. Natl. Bank v. Dunkle, 65 W.Va. 210, 214, 64 S.E. 531, 532; Hawkins v. Bare, 63 W.Va. 431, pt. 1 syl., 60 S.E. 391; State ex rel. Matheny v. County Court, 47 W.Va. 672, pt. 7 syl., 35 S.E. 959. Mandamus is not proper "where the right to such relief is of doubtful or uncertain character." State ex rel. Churchman v. Hall, etc., et al., 86 W.Va. 1, pt. 3 syl., 102 S.E. 694.
From the cases referred to above, I believe it is proper to conclude that a writ of mandamus will issue only upon a showing of a clear legal right, never in a doubtful case and never when it appears that its issuance may prove to be fruitless, unavailing or nugatory. If there is a likely possibility that issuance of the writ may prove fruitless, unavailing or nugatory, then, I believe, there is no showing of "a clear legal right."
The majority opinion impliedly recognizes that this unusual burden is generally upon the relator in a mandamus proceeding but, by a process of reasoning to which I am unable to subscribe, holds that in the present case the relators are somehow relieved of that burden and that a burden is cast upon the respondents to show negatively that the referendum petition is not legal, genuine and proper. This proposition will be referred to subsequently herein, but in that connection we must bear in mind the universal rule that, unlike the burden of going forward with the evidence, the ultimate burden of proof never shifts. Brace v. Salem Cold Storage Co., W.Va., pt. 4 syl., 118 S.E. 2d 799.
Mandamus is not a writ of right but its issuance or refusal lies in the sound discretion of the court. 55 C.J.S. Mandamus § 9, page 25, and § 9b, page 29. See also State ex rel. White Oak Fuel Co. v. Davis, 74 W.Va. 261, pt. 4 syl., 82 S.E. 207; State ex rel. Kanawha Banking & Trust Co. v. Melton, 62 W.Va. 253, pt. 8 syl., 57 S.E. 729. A mandamus proceeding is "one in which the appeal is to the conscience of the court having jurisdiction to hear it." Gardner v. Bailey, 128 W.Va. 331, 336, 36 S.E.2d 215, 218. Members of the council of the City of Huntington are public officials, charged by oath of office with difficult official responsibilities, fiscal and otherwise. Inasmuch as mandamus is not a writ of right but its appeal is to the conscience of the court, based upon equitable considerations, I believe firmly that this Court should not intervene by mandamus in the performance of official duties by respondents unless it appears clearly that the respondents are acting arbitrarily, capriciously or in violation of clear legal mandate. To me the contrary is quite manifest.
In the second point of the syllabus, the majority opinion recognizes that "The city council or city clerk has the right and duty to determine the sufficiency of a petition filed under the provisions of Code, 8A-2-2, as amended, * * *." As a matter of fact, this proposition is admitted by relators in their mandamus petition wherein they state: "Thereupon it became the duty of the respondents * * * to promptly determine that said petitions contained the requisite number of signatures of voters of the city * * *." To me this proposition, *192 which I believe to be unassailably correct, is out of harmony with the statement in the fourth point of the syllabus that "when a proceeding is instituted in a court all of the issues involved in the proceeding are to be determined by the Court and not the parties." Either the respondents have "the right and duty to determine the sufficiency of a petition" or they do not. The institution of a proceeding in mandamus cannot add to or detract from such right and duty.
In the fifth point of the syllabus, the majority opinion sets forth its conclusion that "the validity" of the referendum petition "is neither admitted nor denied" by the respondents and that under such circumstances "the burden" is upon the respondents "and if no evidence is taken or submitted thereon it will be presumed by the court that the petition is valid." (Italics supplied). I take issue with the sweeping conclusion that the "validity" of the referendum petition is not challenged in answers filed by the respondents. I also take issue with the assertion that "no evidence is taken or submitted thereon" in the light of the stipulation of facts filed in response to the issue developed by the pleadings. I cannot agree with the legal conclusion that "it will be presumed by the court that the petition is valid" in view of the answers filed by the respondents which challenge the legality and sufficiency of the referendum petition and in view of the stipulation disclosing that the referendum petition admittedly is, in part at least, based on forgery, fraud, spurious signatures and signatures of unqualified voters.
In the joint answer filed by respondents, they deny the allegation of the mandamus petition that the respondents have failed to take any action in relation to the referendum petition and that their conduct in the premises is "contrary to law, arbitrary, unreasonable, capricious, fraudulent" and the respondents in their answer call for strict proof of such allegation.
The answer further alleges that the relators assisted in the circulation and filing of the fire service petition purporting to contain 17,842 signatures, and the refuse removal fee petition purporting to contain 18,524 signatures; that such two petitions were filed on July 7, 1962; that two days later the relators filed the referendum petition purporting to contain 15,572 signatures or a total of 51,938 purported signatures on the three petitions; that the two fee ordinances are designed to raise annually approximately a half million dollars in revenue, which expected revenue was considered in making the municipal budget for the fiscal year beginning July 1, 1962; that the relators have insisted that the respondents first determine the validity of the referendum petition but that the respondents have insisted upon checking first the two fee ordinance petitions because they were filed first and because of the importance of the two fee ordinances to the municipal budget and fiscal affairs; that nine full-time municipal employees have been assigned to the task of checking the petitions; that the task of checking the petitions "has proceeded with rapidity and dispatch and without any delay of any kind whatsoever from the time said petitions were filed;" that the process of checking the referendum petition "has developed innumerable instances of duplications of signatures, numerous different signatures signed by the same person, innumerable signatures of persons who are not registered voters within the corporate limits of the City of Huntington, many of whom reside out of the City of Huntington and out of the State of West Virginia;" that "approximately 33 to 40 percent of the signatures examined have proved to be invalid;" and "that because of the large percentage of invalidity, grave doubts as to the validity of all of said petitions exists; that this is well known to the relators who would greatly prefer to compel an election to be held before the authenticity of the petition can be ascertained in an orderly manner;" (italics supplied) and that the "respondents do not question the constitutional rights of the electorate to require an election on the issues involved in the event it is established that they have *193 filed a valid and subsisting petition as provided by law."
The relators have not denied the wholesale forgeries and improper signatures as alleged by the respondents. On the contrary, they admit the truth of such allegations by stipulating the correctness thereof. A portion of the written stipulation, constituting the only proof in support of any allegations made on either side, is as follows:
"Immediately after the receipt of the three petitions hereinabove mentioned, the same were examined by the members of the Council, and it appeared that a number of petitioners had signed the same petition more than once, that signatures of different petitioners had been signed by one person, that many of the petitioners gave addresses which were outside the City of Huntington, and, in several instances, in adjoining states, and that some of the petitioners known to members of Council were minors, or otherwise unqualified to vote. * * *

* * * * * *
"* * * Four regular employees of the City were assigned full-time to the task of checking these petitions and five additional full-time clerical workers were employed. The cost to the City of Huntington of checking these petitions to date has been in excess of $4,000. To date, 4,527 names have been checked on the fire petition and it appears to the City Clerk that 1,533 names on said petition are invalid because of duplication, false signatures, lack of current voter registration of the signers, lack of voting qualifications, or for other reasons. In the case of the refuse removal petition, 4,526 names have been checked and it appears to the City Clerk that 1,499 names signed to this petition are invalid for similar reasons. 458 signatures appearing on the charter petition have been examined. 129 signatures have been found by the City Clerk to be duplications or forgeries, or have been found to be invalid because of lack of current voter registration of the signer, lack of other voting qualifications and for other reasons, 112 signatures have been found to be valid, and 217 signatures have yet to be checked for forgery, current voter registration of the signer or for other voting qualifications of the signatories."
In the face of the admitted fact that the council proceeded immediately to check the validity of the petitions, assigning nine full-time employees to the task, at a cost of more than $4,000, the majority opinion makes the summary, sweeping conclusion: "Under the facts and circumstances in the case at bar the respondents have not acted within a reasonable time to determine the validity of the petition. In fact, they have not acted at all in connection with this matter * * *."
In such circumstances the majority opinion holds that no issue on the validity of the referendum petition is made because the respondents by answer have not in haec verba either affirmed or denied the genuineness and validity of the petition; and this in spite of the undenied allegations of numerous instances of fraud, forgery, duplication of signatures and lack of voter qualification; and in spite of the written stipulation which constitutes a formal admission that the petition is pro tanto fraudulent, illegal and invalid. The majority opinion produces an anomalous result. It recognizes the right and duty of the council to determine the legality and validity of the referendum petition, and yet would impose upon the respondents the burden of alleging the invalidity of the petition as a prerequisite to the exercise of the right and duty to determine such invalidity or illegality.
The majority opinion, in effect, holds that the validity of the referendum petition has not been challenged in this proceeding in spite of the undenied allegation of forgery and fraud; in spite of the admission by stipulation that the petition is in part based on fraud and forgery; and in spite of the respondents' *194 allegation that the circumstances create grave doubts as to the validity of each of the three petitions.
The immediate issue in this case is not the validity or invalidity of the referendum petition. Since the parties agree and the majority has recognized the right and duty of the respondents to determine whether the referendum petition contains the requisite number of valid signatures of qualified voters, the issue in the case is whether the respondents proceeded properly in the exercise of that right and the discharge of that duty. The relators have alleged that the respondents'"failure to perform their duties hereinabove set forth is contrary to law, arbitrary, unreasonable, capricious, fraudulent and the result of a misapprehension of the law." The respondents specifically deny these allegations and allege that, on the contrary, they have acted lawfully, expeditiously and in good faith. The majority opinion holds that the respondents have acted improperly in such a manner that their actions are subject to judicial control by mandamus. I strenuously disagree with the majority at that point. Such being the genuine and immediate issue, the respondents were not required to allege that the referendum petition was invalid. They did not have a burden of proving a negative. It was incumbent upon them merely to allege a proper, lawful and expeditious performance of their right and duty to determine the legality of the petition. This they have done.
In view of the majority holding, it would be futile for respondents to have proceeded to determine the validity of the referendum petition. If they had done so, and if the petition had been found to be illegal and invalid prior to November 6, 1962, they would have been required to hold the election on that date nevertheless, because this Court has intervened by mandamus in the midst of the performance of the recognized right and duty, and has adjudged that the election must be held in any event. The respondents, as sworn public officers charged with grave fiscal responsibilities, were required by duty and by official oath to be concerned with the possibility of the needless expense of a vain, illegal and abortive election. It is not so much a question whether the respondents may determine at what election the issue is submitted as it is a question whether the relators have a right to dictate that fact and make that determination.
In spite of the filing of the written stipulation of facts stating that the facts therein alleged "shall be taken as true and correct," the majority opinion implies in the fifth point of the syllabus that "no evidence is taken or submitted" in response to the issue of the validity of the petition.
Finally, the Court holds in the majority opinion that there obtains a presumption of the genuineness and validity of the referendum petition, in spite of the undenied allegation of false, fraudulent or illegal signatures; in spite of the written stipulation of facts, the only proof offered in the case, admitting the partial illegality and fraudulent nature of the referendum petition; and in spite of the respondents' allegation that circumstances and facts alleged cause "grave doubts" as to the genuineness of all of the three petitions circulated, procured and filed by the relators.
It is my understanding that we indulge in presumptions only in situations where nothing to the contrary appears. No presumption can stand in the face of facts. Dwight v. Hazlett, 107 W.Va. 192, 200, 147 S.E. 877, 880, 66 A.L.R. 102, citing Wigmore and Jones in their respective works on Evidence. See also Beckley Natl. Exchange Bank v. Provident Life & Accident Ins. Co., 121 W.Va. 152, 154, 2 S.E.2d 256, 257; Lambert v. Metropolitan Life Ins. Co., 123 W. Va. 547, 17 S.E.2d 628; Jenkins v. Spitler, 120 W.Va. 514, pt. 2 syl., 199 S.E. 368; 31 C.J.S. Evidence § 117, pages 731-732. "A `presumption' is a rule of law that courts or juries shall or may draw a particular inference from a particular fact or from particular evidence, unless and until the truth of such inference is disproved." State v. Dodds, 54 W.Va. 289, 296, 46 S.E. 228, 231. *195 See also 7 M.J., Evidence, § 17, page 347. In accordance with the principles stated immediately above in the case of State ex rel. McNary v. Olcott (1912), 62 Or. 277, 125 P. 303 it was held: "Where referendum petitions contain evidence of forgeries, perpetrated either by the circulators, or with their connivance, the prima facie case in favor of the genuineness of the petitions is overcome; and the burden is on those upholding the validity of the petition to establish the genuineness of each signature." The same principle is stated in similar language in 28 Am.Jur., Initiative, Referendum, and Recall, § 25, page 454: "Where it has been shown that certain circulators of petitions have been guilty of forgery, the prima facie case made by the affidavit in favor of the genuineness of their petitions is overcome, and in the absence of evidence supporting the genuineness of the signatures, all signatures on such petitions should be rejected. But in the absence of evidence of intentional fraud or guilty knowledge on part of the circulator, the names on a petition properly verified are prima facie genuine."
It is here observed that no statute of this state and no ordinance of the City of Huntington provides for a verification or certification by the circulator that the signatures appearing on a referendum petition are genuine. No statute or ordinance provides that a referendum petition is prima facie genuine or is presumed to be genuine. No statute or ordinance provides a criminal penalty for making or procuring a false signature on such a petition, so as to apply the presumption that all persons obey the law until the contrary appears. In the absence of any statute or ordinance of the nature referred to above, I believe that no substantial authority can be found for a presumption of the genuineness of the signatures on the petition herein involved. But even if there were such a presumption of genuineness, it could not be applied in this case wherein evidence of a lack of genuineness appears on the face of the petition, from undenied allegations of respondents' answers and from a written stipulation of facts made and filed as proof in the case in this Court.
We need cite no authority for the proposition that mandamus cannot be employed to control, or override the discretionary power of a public official, in the absence of a clear showing of arbitrary or capricious conduct. If the effect of the majority opinion is to say that the respondents must first consider the referendum petition before considering either of the two fee ordinance petitions, then I say this Court is improperly undertaking to control or override the discretion of the municipal officials. If, on the other hand, the effect of the majority opinion is to hold that the council has taken an unreasonable length of time in considering the three petitions purporting to contain a total of 51,938 signatures, then I believe the Court's holding is wholly unwarranted by the facts.
The majority reads into the statute a requirement which I do not find expressed therein. The statute does not say that the election shall be held at the next regular election or the first municipal election, whichever comes first; this Court says that. If the legislature had wanted to provide that the council must proceed within about ninety days to arrange for the election, I am willing to assume that the legislature would have known how to express such requirement. On the contrary, the legislature provided, in effect, that if the referendum petition had been filed in less than thirty days before November 6, 1962, the respondents could not have required an election prior to November, 1964, a period of more than two years. The legislature merely provided for submission of the question to the voters "at any general election or at a regular or a special municipal election."
We should bear in mind also that the respondents have not refused to submit the issue to the voters. They recognize the mandatory duty imposed by the statute upon the timely filing of a legal and proper petition. At most the respondents have only delayed the submission of the issue to the *196 voters. "Mandamus will not issue to compel a party to perform an act which he has already begun to do, and it is apparent that he will in good faith perform." State ex rel. Hall v. County Court, 100 W.Va. 11, pt. 2 syl., 129 S.E. 712. "Mandamus will not issue if the duty sought to be enforced has already been done or is being performed or if the defendant shows a willingness to perform without coercion." 55 C.J.S. Mandamus § 10b, page 34. Mandamus will not issue if the defendant has not refused to perform the act, the performance of which is sought. State ex rel. Beckley Newspapers Corpn. v. Hunter, 127 W.Va. 738, pt. 1 syl., 34 S.E.2d 468.
The majority opinion recognizes the right and duty of the respondents to determine the genuineness and legality of the referendum petition. I believe this right and duty are accentuated and enhanced by the obvious, admitted evidence of fraud, forgery and voter disqualification. And yet, having recognized that right and duty, the majority opinion, in my judgment, precludes the exercise in good faith of the right and the expeditious, efficacious performance of the duty.
For the reasons stated, I would deny the writ of mandamus on the general ground that the relators have not shown a clear legal right to the relief sought by them.
I am authorized by Judge BROWNING to say that he joins in the views expressed in this dissenting opinion.