CHARLES COWAN, *on his own behalf and on behalf of all others similarly situated, et al.*

*v.*

THE COUNTY COMMISSION OF LOGAN COUNTY, *et al.*

(No. 13929)

Decided December 20, 1977.

*Bowles, McDavid, Graff & Love, Roger W. Tompkins, II and Ricklin Brown,* for relators.

*Zane Grey Staker and Paul E. Pinson,* for respondents.

McGRAW, JUSTICE:

Charles Cowan and other freeholders of the Buffalo Creek area in Triadelphia District, Logan County, West Virginia filed on March 5, 1975, a petition with the County Commission[1] of Logan County as the preliminary legal step under *W.Va. Code,* 8-2-3,[2] to incorporate Buffa-

---

[1] County Commissions were called County Courts until the passage of Article IX of the Judicial Reform Amendment, ratified in 1974. They are the governing tribunals for counties.

[2] Three sections of the West Virginia statutes, W.Va. *Code,* 8-2-1, 2 & 3, are immediately involved. The sections provide as follows:

§ 8-2-1. Any part of any county or counties, not within any municipality, urban in character, and containing at least one hundred inhabitants (if such part contains less than one square mile), and an average of not less than five hundred inhabitants per square mile (if such part contains one square mile or more), provided such part does not include an amount of territory disproportionate to the number of inhabitants thereof, may be incorporated, depending upon population, as a city, either a Class I, Class II or Class III city, or as a Class IV town or village, as classified in section three [§ 8-1-3], article one of this chapter, upon the conditions and in the manner hereinafter prescribed: Provided, that the exact extent of the territory or portions thereof to be included or excluded shall be within the reasonable discretion of the county court, taking into

lo Creek Valley as a Class III city. Their petition was rejected by the commission as not sufficient and, on resubmission and after an evidentiary hearing, it was dismissed for not meeting requirements of the law. They petitioned this Court for a writ of mandamus to require the commission to act on their petition, but, under Rule

consideration the topography thereof, the benefits thereto from incorporation, the amount of uninhabited land required for parks and recreational use and normal growth and development and the present and probable future use thereof, so as to prevent hardships and inequities.

§ 8-2-2. A proceeding to incorporate any such city, town or village shall be initiated upon petition addressed to and filed with the county court of the county in which the territory is located, or if in more than one county in which the major portion of the territory is located, indicating whether the territory sought to be incorporated will be upon incorporation, depending upon population, a Class I, Class II or Class III city or a Class IV town or village. Such petition shall be signed by at least thirty percent of the freeholders of the territory to be incorporated.

Such petition shall be verified by at least one of the petitioners and shall be accompanied by a map made by a professional engineer registered under the laws of this State, which map shall be based upon an actual and accurate survey of the territory to be incorporated showing the courses, distances and the area of the territory to be incorporated.

Such map shall be verified and shall be left at the residence or place of business within the territory to be incorporated of some individual residing or some person doing business therein, and shall be subject to examination at all reasonable hours by every person interested in such application for a period of at least ten days prior to the hearing on such petition as provided for in section three [§ 8-2-3] of this article.

§ 8-2-3. Upon the filing of such petition, the county court shall set the same for hearing not sooner than ten days and not later than thirty days thereafter, and the petitioners shall cause notice of the filing of the petition and of the date, time and place of hearing thereon to be published as a Class II legal advertisement in compliance with the provisions of article three [§ 59-3-1 et seq.], chapter fifty-nine of this Code, and the publication area for such publication shall be the territory sought to be incorporated.

Upon the date set for hearing, the county court shall hear evidence for and against the proposed incorporation, and if it shall determine that the requirements of sections one and two [§§ 8-2-1 and 8-2-2] of this article have not been met, it shall forthwith enter an order dismissing said petition.

XVIII of the Rules of Practice in the Supreme Court of Appeals, the prayer of their petition was denied without prejudice. They petitioned the Circuit Court of Logan County for a writ of mandamus to compel the commission to act on their incorporation petition, but that court sustained respondents' demurrer and dismissed the mandamus action. Petitioners elected not to appeal the dismissal action of the lower court and again, on May 9, 1977, filed in this Court their petition for a writ of mandamus against the respondents, stating therein that "it is now clear that adequate relief in the Circuit Court of Logan County has been exhausted."

The prayer of the petitioners follows:

WHEREFORE, petitioners pray that this Court issue against respondents a rule, returnable at such date as the Court may fix and determine, requiring respondents to show cause, if they can, why there should not be awarded a preemptory [sic] writ of mandamus in accordance herewith, and otherwise as the Court may deem proper; and that upon return of such rule there be awarded and issued a preemptory [sic] writ of mandamus commanding respondents to:

(1) Enter an Order stating (a) that the requirements of Chapter 8, Article 2, Sections 1 and 2 by the West Virginia Code, as amended, have been met by the documents attached hereto and previous submitted to them; (b) that the application of Amherst Coal Company, Island Creek Coal Company and Kelly-Hatfield Land Company, seeking to exclude certain of their properties from the area proposed to be incorporated, be denied, and (c) that a census be conducted and a general election be held on the question of incorporation pursuant to the provisions of Chapter 8, Article 2, Section 4 of the West Virginia Code, 1931, as amended; or in the alternative,

(2) Enter an Order stating (a) specifically and in detail which requirements of the aforesaid statutory provisions have not been met, and (b) that, if such specific and detailed requirements

are met, the respondents will thereupon order a census to be taken, the qualifications of electors to be determined and an election to be held and the results thereof ascertained pursuant to section 4 of the aforesaid statute, and

(3) Act in accordance with such other relief as the nature of this case requires and as this Court may deem just and proper.

On the petition, a rule to show cause was granted on May 16, 1977, and made returnable on June 14, 1977, when the cause was submitted for decision on briefs and arguments of counsel.

## I. THE COUNTY COMMISSION

A brief review of the role a county commission plays in incorporation proceedings is in order. Statutes such as those in West Virginia which delegate to another body, such as the county commission, a role in the formation of political districts or municipal corporations have been subject to repeated constitutional attacks over the years for violating the constitutional limitation separating the powers of government. *See Wiseman v. Calvert*, 134 W. Va. 303, 59 S.E.2d 445 (1950); Annot., 69 A.L.R. 266 (1930). Many statutes have been struck down because they permitted a court "in its discretion," or "if justice and equity require," or "if [it] is of the opinion that the prayer of the petition should be granted," to grant the relief prayed for. *Lyon v. The City of Payette*, 38 Idaho 705, 224 P. 793 (1924). The invalid statutes vested the tribunal with discretion as to whether the property should be incorporated, thus constituting an unconstitutional delegation of power. As stated in *West v. West Virginia Fair Association*, 97 W. Va. 10, 15, 125 S.E. 353, 355–56 (1924) and *Wiseman v. Calvert*, 134 W. Va. 303, 316, 59 S.E.2d 445, 453 (1950):

"It is very generally held that the legislative department of the government cannot delegate its power of legislation to either of the other coordinate branches of the government, but it may delegate the power to determine some fact or

state of things upon which it will make its own action or grant depend. The power to create municipalities cannot be delegated, but the Legislature may confer upon a court or some administrative officer or board the power to perform some judicial or ministerial act in the formation of such public corporation, or to ascertain and determine whether the conditions prescribed by the statute as to the formation of corporations and the granting of the charter has properly come into existence."

This same idea was expressed several years earlier in *Morris v. Taylor*, 70 W. Va. 618, 622, 74 S.E. 872, 874 (1912):

"The legislature has granted that right [to form municipal corporations] to all of the people of the state, who put themselves within the conditions annexed. What the court determines is whether the people desiring to form such a corporation have put themselves within those conditions ... Having ascertained that, the court awards a certificate of incorporation, just as the secretary of state issues the certificate of incorporation to a joint stock company ... The court has no initiative. Its sole power is to veto ...."

The county commission, then, acts as an agency of the legislature performing a ministerial act in the formation of public corporations. When a petition by freeholders for incorporation of a city, town or village pursuant to *W.Va. Code*, 8-2-1 is filed with the county commission under W.Va. *Code*, 8-2-2, the petition is then set for hearing and a determination by the commission as to whether the requirements of §§ 1 and 2 have been met. If the requirements have not been met, the petition will be dismissed. If the requirements are met, proceedings must then go forward for posting bond, taking a census, conducting an election, and satisfying other statutory requirements for incorporation of the city. The purpose of the petition is to provide an orderly process for initiating an election to vindicate constitutional rights to local self-government.

The Court is aware that *W.Va. Code*, 8-2-1 purports to vest discretion in the county commission to set the exact boundaries of the proposed municipality. We need not determine at this point whether that part of the statute violates the principles of separation of power discussed above. Any such exercise of discretion would have to be reasonably based upon and supported by the record. A close review of the record in this case reveals that there is nothing to justify an excercise of discretion which would alter the boundaries from those proposed by the petitioners.[3] The evidence of record adverse to petitioners regarding boundaries is that the proposed municipality is long and narrow[4] and that the corporate objectors want their property excluded so they would not have to pay tax. Neither of these considerations would support any deviation from the boundaries proposed by the petitioners.

## II. BURDEN OF PROOF

In the discharge of its duties in incorporation proceedings, the county commission must consider the evidence brought before it. But there are crucial questions that are not adequately resolved by our prior cases. We must decide who has the burden of proving compliance with the statutes, and what effect is to be given the verified petitions and maps which on their face purport to comply with the statutory requirements.

The burden of proving that the statutory prerequisites have been met must logically fall upon those who seek to establish the municipality. But what effect is to be given to the verified petitions and maps which are sworn to be in compliance with the Code? The rule we adopt, well-established in several other jurisdictions, is

---

[3] This case is unusual in that the Court has before it the entire record of the proceedings before the county commission as an exhibit to the pleadings. Consequently, we are able to review the facts and findings in regard thereto.

[4] Long, narrow, ribbon-like communities are characteristic features of human settlements in the valleys of the central Appalachian plateau of North America.

that the petition and accompanying papers duly verified constitute a prima facie case. *E.g., State v. Church,* 158 S.W.2d 215 (Mo. 1942); E. McQuillan, *Municipal Corporations* §§ 3.28d & 3.33b (rev. 3d ed. 1971).

Once the verified affidavit is filed and alleges compliance with all of the statutory requisites found in W. Va. Code §§ 8-2-1 & 2, then the burden shifts to the objectors to show that the code is in fact not met. That the burden of showing noncompliance is on the objectors is well-established in our law. Syl. Pt. 4, *State ex rel. Bess v. Black,* 149 W. Va. 124, 139 S.E.2d 166 (1964); syl. pt. 5, *State ex rel. Plymale v. Garner,* 147 W. Va. 293, 128 S.E.2d 185 (1962). Thus, a duly-verified petition and map constitute a prima facie case consistent with the existing case law.

The court reports are replete with other instances where citizens have joined together and amassed petitions only to have them deemed technically insufficient by some governmental body. In virtually every instance this Court has by mandamus ordered the petitions to be accepted. *E.g., State ex rel. Plymale v. Garner, supra,* (city council compelled to accept petition to submit to voters the question of whether a charter should be passed); *State ex rel. Wells v. City of Charleston,* 92 W. Va. 61, 114 S.E. 382 (1922) (mayor and city council compelled to accept a petition calling a special election on a proposed amendment to an ordinance); *State ex rel. Marcum v. Wayne County Court,* 90 W. Va. 105, 110 S.E. 482 (1922) (county court ordered to accept petition to hold election on whether to relocate county seat); *State ex rel. Noyes v. Lane,* 89 W. Va. 744, 110 S.E. 180 (1921) (city clerk compelled to certify and approve recall petition); and *Doolittle v. County Court of Cabell County,* 28 W. Va. 158 (1886) (county court ordered to accept petition and hold a vote on the relocation of county seat).

The case which best indicates why the burden of proving invalidity rests on the objectors is *State ex rel. Bess v. Black, supra,* where a petition was presented seeking a local option election pursuant to *W.Va. Code,* 61-10-28:

"Upon the filing of a petition for a local option election in accordance with the provisions of this section, the county court shall enter an order calling a local option election . . . ."

In that case, the county court, upon the filing of petitions containing 7,261 professed voters of Cabell County, directed its clerk to make an investigation and determined that 1,423 signatures were invalid. Since 5,954 voters of that county would be needed to constitute 10 percent of the registered voters, an additional petition was filed containing additional signatures, which, added to the previously declared valid names, constituted more than the necessary 10 percent. The members of the county court made no investigaton of the signatures on this added petition. The court found that it had no recourse but to find that there were sufficient unchallenged names on the petition to require this question to be submitted to the voters. Judge Browning said:[5]

"Certainly it could not be seriously contended by anyone that the members of the county court, when confronted in this Court by a proceeding in mandamus upon the face of the record of which there appeared to be a sufficient number of signatures to require the submission of the question to the voters of a county, could shift the responsibility for establishing before this Court the validity thereof to the petitioners rather than for that responsibility to fall upon the members of the county court. If that were true, there would probably never be held any such election if the county commissioners did not desire to hold one. If the petitioners in mandamus could be required to again prove the validity of the signatures upon their petition, after having complied with the statute by doing it once, it would probably be impossible for the citizens of any county to secure local option vote upon this question." *State ex rel. Bess v. Black, supra,* at 133, 139 S.E.2d at 171-72.

---

[5] The Hon. Chauncey Browning was from Chauncey in Logan County. His candid discussion of the problem evidences a true understanding of the realities involved in these situations.

In reviewing the county commission's rejection of the petition and map, we must determine, therefore, whether the objectors sufficiently met their burden of proving that the petition and maps were not in compliance with the code.

## III. THE PETITION SUBMITTED

The Buffalo Creek Valley petition was considered by the County Commission of Logan County at their meeting on March 5, 1975, and after examination, the commission "determined that the petition and maps attached thereto did not meet the requirements stated in the West Virginia Code" and the petition was rejected—not dismissed after hearing. In paragraph V of their petition for mandamus, petitioners "submit that all of the requirements of sections 1 and 2 of the statute were met in the initial filing." At the county commission's meeting on April 7, 1975, the freeholders' petition for incorporation of the city was resubmitted together with "revised supplemental maps." Thereupon the commission set the incorporation petition for hearing on May 6, 1975, at which time evidence and arguments for and against incorporation were heard. The order of the commission, acting on the petition, entered June 2, 1975, is as follows:

> "Evidence was adduced in favor of the proposed city, opposed to the proposed city, regarding the proposed boundary lines of the proposed city and in reference to the validity of the names on the said petition; the total number of freeholders within the proposed boundaries, and the accuracy and validity of the map filed with said petition.

> "The Commission, upon mature consideration of all such, does determine that the requirements of Chapter 8, Article 2, Section 1, and Chapter 8, Article 2, Section 2, have not been met and accordingly ORDERS and ADJUDGES that the Petition filed herein requesting said incorporation is hereby dismissed."

The County Court, in a "Supplemental Statement of Findings of Fact and Reasons for Denial of Petition by County Commission of Logan County In Re: Petition to Incorporate Buffalo Valley as a Class III City," enumerated eight propositions justifying its action dismissing the petition after the hearing of May 6, 1975. The effect of this statement was to deem the petition insufficient because of a lack of further proof on the part of the petitioners at the hearing.

The evidence brought forth by the petitioners consists of a "Petition to Incorporate Buffalo Valley as a Class III City." This verified petition also contains 434 signatures preceded by eight enumerated statements that the statutory requisites have been met. The verified statements pertinent to this case are:

"1. That the territory sought to be incorporated is located wholly within Logan County, West Virginia, and in Tridelphia District thereof and does not include any territory within the corporate limits of any existing municipality.

"2. That the territory has a population exceeding five hundred per square mile, is urban in character and otherwise meets the requirements for incorporation as a municipality as set forth in Chapter eight, Article Two of the Official Code of West Virginia, 1931, as amended.

"3. That more than thirty per cent (30%) of the freeholders of said territory sought to be incorporated have signed this petition.

"5. That this petition is verified as required by law.

"6. That this petition is accompanied by a map made by the engineering firm of Howard, Needles, Tammen and Bergendoff and verified by a professional engineer registered under the laws of this State, which map is based upon an actual and accurate survey of the territory to be incorporated, showing the courses, distances and the area of the territory to be incorporated.

"7. That said map is verified and will be posted and made available for examination by all persons interested for more than ten (10) days prior to any hearing held on this petition as required by law."

The petition was verified by one of the signers, Charles Cowen, who testified at the hearing but was not cross-examined on any of these points. The record is devoid of any evidence refuting the prima facie case made in the paragraph concerning population and urban character. In fact, the record, taken in its totality, would show substantial population and urban character. The supplemental statement, therefore, fails on these points.

The bulk of the evidence that militated against the claim by petitioners that they had the requisite number of signatures of the freeholders[6] of the area sought to be

---

[6] *W.Va. Code*, 8-1-2 (14) & (15) define "freeholder" and "freehold interest in real property" as follows:

(14) "Freeholder" shall mean any person (and in the case of an individual one who is sui juris and is not under a legal disability) owning a "freehold interest in real property";

(15) "Freehold interest in real property" shall mean any fee, life, mineral, coal or oil or gas interest in real property, whether legal or equitable, and whether as a joint tenant or a tenant in common, but shall not include a leasehold interest (other than a mineral, coal or oil or gas leasehold interest), a dower interest, or an interest in a right-of-way or easement, and the freehold interest of a church or other unincorporated association shall be considered as one interest and not as an individual interest of each member thereof.

There appears to be an inconsistency, not raised by petitioners, between these definitions and the Constitution of West Virginia. The Code says that an area can be incorporated only upon the filing of a petition signed "by at least thirty percent of the freeholders of the territory to be incorporated." *W.Va. Code*, 8-2-2. But the Constitution of West Virginia nowhere restricts the right to govern to "freeholders" as statutorily defined.

A *majority of the community* is reserved valuable political rights in *West Virginia Constitution* Article III, § 3.

§ 3. Government is instituted for the common benefit, protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and

incorporated was the testimony under oath of attorney Edward I. Eiland, who was the lawyer representing at

when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal.

A mere ten percent of the registered voters of a given county have the power to initiate changes in their county commission while a majority of *registered voters* can replace it with another tribunal. *West Virginia Constitution* Article IX, § 13.

§ 13. The legislature shall, upon the application of any county, reform, alter or modify the county commission established by this article in such county, and in lieu thereof, with the assent of a majority of the voters of such county voting at an election, create another tribunal for the transaction of the business required to be performed by the county commission created by this article. Whenever a county commission shall receive a petition signed by ten percent of the registered voters of such county requesting the reformation, alteration or modification of such county commission, it shall be the mandatory duty of such county commission to request the legislature, at its next regular session thereafter, to enace an act reforming, altering or modifying such county commission and establishing in lieu thereof another tribunal for the transaction of the business required to be performed by such county commission, such act to take effect upon the assent of the voters of such county, as aforesaid. Whenever any such tribunal is established, all of the provisions of this article in relation to the county commission shall be applicable to the tribunal established in lieu of said commission. When such tribunal has been established, it shall continue to act in lieu of the county commission until otherwise provided by law.

But more importantly, the legislature was expressly required by *West Virginia Constitution* Article VI, § 39(a) to enact general laws for the incorporation and government of cities, towns and villages granting to the *electors* of each municipal corporation the power to self govern:

§ 39 (a). No local or special law shall hereafter be passed incorporating cities, towns or villages, or amending their charters. The legislature shall provide by general laws for the incorporation and government of cities, towns and villages and shall classify such municipal corporations, upon the basis of population, into not less than two nor more than five classes. Such general laws shall restrict the powers of such cities, towns and villages to borrow money and contract debts, and shall limit the rate of taxes for municipal purposes, in accor-

this hearing three corporations that objected to the proposed incorporation.[7]

dance with section one, article ten of the Constitution of the State of West Virginia. Under such general laws, the electors of each municipal corporation, wherein the population exceeds two thousand, shall have power and authority to frame, adopt and amend the charter of such corporation, or to amend an existing charter thereof, and through its legally constituted authority, may pass all laws and ordinances relating to its municipal affairs: Provided, that any such charter or amendment thereto, and any such law or ordinance so adopted, shall be invalid and void if inconsistent or in conflict with this Constitution or the general laws of the State then in effect, or thereafter, from time to time enacted.

And quite recently this Court, in *State ex rel. Piccirillo v. Follansbee*, ___ W. Va. ___, 233 S.E.2d 419 (1977), said that the State may not place a property restriction qualification on candidacy for the office of city council. One might readily question the validity of a statutory scheme that limits the rights of self-government to "freeholders" as defined.

[7] This Court, along with most, has strenuously discouraged attorneys from testifying at matters in which they appear as counsel. 6 Wigmore, Evidence § 1911 at n. 10 (Chadbourn rev. 1976). An early example of this appears in *Moats v. Rymer*, 18 W. Va. 642, 645 (1881):

"Fortunately the books show very few cases, in which lawyers have become witnesses for their clients. While there are some cases of an extreme character, in which such practice is necessary, ordinarily it is much to be regretted, that such a practice should exist or be encouraged. So reprehensible is the practice generally, that it has been much doubted, whether a lawyer is a competent witness for his client."

Later the Court in *Edmiston v. Wilson*, 146 W. Va. 511, 531, 120 S.E.2d 491, 502 (1961) said:

"Any practice which enables an attorney, while engaged in the prosecution or the defense of litigation, to testify as a witness in the course of such litigation is emphatically disapproved by this Court."

Notwithstanding the ethical problems which exist when an attorney representing a party testifies in a given matter, one can only conclude that the uncorroborated testimony of Mr. Eiland to the effect that the petition failed to include 30 percent of the freeholders in the area sought to be incorporated was totally self-serving and admittedly questionable.

Mr. Eiland and his clients herein will be pursuing a perilous course if they continue in their quest to influence the vote on this

He represented that he had prepared a list of 1,660 freeholders. If, of course, there were that many freeholders, then the petition for incorporation would be inadequate in that it would fail to contain the requisite 30 percent of signatures. Mr. Eiland states that "there may be instances where I am wrong. I don't know. I am told that this proposed incorporation does not include the town of Saunders and I listed several parcels from the area . . . I have tried to be as accurate as I can. I sometimes make mistakes but there is the list." Later, after testifying about the law governing incorporation, Attorney Eiland was cross-examined. In response to the question "The proposed municipality goes from Kessler to Pardee, is it not a fact that your list contains people who live as far as seven miles beyond Pardee?" Eiland answered: "Well, I don't know the distance." When asked, "[Y]ou are not sure the areas you included in your list are in fact the same and only the same areas included in the proposed incorporation area?" he answered, "That's right." He further admitted on cross-examination that his list was not verified and was not certified by any county official.

The Court detects a problem with Mr. Eiland's testimony. His unverified, uncertified list of 1,660 purported freeholders is, by his own admission, drawn from a larger, more inclusive area than the proposed corporate limits.

---

public question. The crucial provision is *W.Va. Code*, 3-9-14 which provides in full that:

"Any corporation which shall, by its officers, agents or otherwise, offer, give or use, or cause to be offered, given or used, or place or cause to be placed, in the possession, under the control or at the disposal of another, to be offered, given or used, directly or indirectly, money or other thing of value, for the purpose of influencing any voter or voters to vote for a particular candidate, or in any particular manner, or upon any particular side of any question to be decided at any such election, or to influence the result of any such election, it shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five thousand nor more than twenty thousand dollars for every such offense, at the discretion of the jury."

Apart from Eiland's testimony, the only other evidence that militates against the petitioners' prima facie case is the testimony of a deputy commissioner who testified that only 425 of the 434 petitioners were freeholders. But since neither the objectors or the commission brought forth evidence as to the total number of freeholders, the burden of proving statutory noncompliance is not met. To say that a few signers were not freeholders is not the same as saying that the remaining valid signatures fail to comprise 30 percent of the freeholders required under W. Va. Code § 8-2-2.

In summary, the record discloses that the testimony of Attorney Eiland and of the deputy clerk constituted the case against the verfied petition which on its face purported to contain signatures of 30 percent of the freeholders in the area sought to be incorporated. We cannot hold the petition invalid on the admittedly inaccurate testimony of an attorney representing corporations which object to the proposed municipality principally because they will have to pay more tax. And although the deputy commissioner could find error in the petitioners' efforts, no showing was made that any aspects of the statutes were not satisfied. Thus, the objectors failed to prove that the petition did not substantially comply with the statute, and the county commission's order to that effect is not supported by the evidence.

## IV. THE MAPS SUBMITTED

The county commission also found the maps which accompanied the petition pursuant to *W.Va.*, *Code*, 8-2-2 to be inadequate.

The statute requires the submission of a map that "shall be based upon an actual and accurate survey of the territory to be incorporated showing the courses, distances, and the area of the territory to be incorporated." *W.Va. Code*, 8-2-2.

The objectors argue and the county commission apparently agreed that the methodology employed by the petitioners failed to comply with the statute since their en-

gineer made no independent measurements on the ground, relying instead on existing maps.

Mr. Harold White, a registered professional engineer under whose direction and supervision the maps were prepared, verified that the maps were based on an actual and accurate survey done by the United States Geological Survey as required by law and that the boundary of the territory to be incorporated was placed on the map under his direction. His verification was attached to the petition submitted to the county commission.

He testified that in his judgment as a professional engineer an accurate and actual survey of the territory to be incorporated showing the courses and distances in the area of the territory to be incorporated was made by using "the existing maps that we utilized and the actual maps of the territory as existed on the dates it was mapped of the courses and distances in effect, and our office survey placed upon the maps." He said after he was given an outline of the area sought to be incorporated, he scaled off coordinates, fed it through their computer, and traced if off showing the courses and distances that were printed out on the computer cards. Although Mr. White made no measurements on the ground himself, he relied on measurements made by the Corps of Engineers in 1966. When asked whether a property owner on or near the perimeter of the map could use the map he prepared and determine whether this property was within or without the boundaries of the proposed municipality, Mr. White stated that "[F]rom the physical features shown on the map, if he can identify his property on the map, his residence, he can scale from the map and determine whether he is inside the corporate limits or not." He testified that this could be done with sufficient accuracy to determine whether he is in the area sought to be incorporated. He indicated that by plotting the courses and distances onto the photogrammetric map, an actual and accurate survey of the territory to be incorporated is created showing the courses, distances and the area of the territory to be incorporated.

Robert L. Long, a civil engineer registered in the State of West Virginia, employed by the objectors to the proposed incorporation, testified regarding the sufficiency of the maps submitted with the petition for incorporation. He testified that he could run the lines shown on the map fairly close but not exactly because the map was not tied into permanent monuments on the ground. He indicated that the map should be tied into something on the ground. He admitted, however, that he also in his practice occasionally relies on metes and bounds surveys conducted by governmental authority in preparing a survey and that this practice is accurate. When asked whether the map was accurate even though it was incomplete in that it did not list the metes and bounds, he answered, "That's right, it's very accurate." He further stated that it would be "possibly not mandatory but desirable" to have permanent markers at various points on the map to be considered proper.

We feel that a requirement that actual ground measurement must be made would be in this case an unreasonable burden. The expense involved would effectively prohibit many groups of citizens from attempting to incorporate. The purpose of the map is to show with reasonable accuracy whose property is within the area to be incorporated so that the citizenry will have notice of the proposal and the hearing held on the proposal and to establish the parameters of the proposed city. The public would realize little, if any, benefit from expensive ground measurements. Any prospective benefits accruing to the public from such measurements are certainly outweighed by the unreasonable burden imposed on those citizens who wish to incorporate for self-government under the statute.

"A statute is to be interpreted in the light of the nature of its subject matter, the purpose of the legislature in passing it, and the conditions and circumstances under which the law making body must have known it would operate; and, upon these considerations, it will not be so interpreted as to make it impose unreasonable bur-

dens, greatly disproportionate to the resultant public benefit, unless its terms are so explicit and positive as to preclude any other construction. Syl. pt. 5, *Pond Creek Pocahontas Co. v. Alexander*, 137 W. Va. 864, 74 S.E.2d 590 (1953), quoting syl. pt. 2, *State v. Baltimore and Ohio Railway Co.*, 61 W. Va. 367, 56 S.E. 518 (1907).

The statute, therefore, contemplates the existence of some "actual and accurate survey" which can serve as the starting point or base for the map to be submitted with the petition for incorporation. The legislature could have expressly required that ground measurements be made, but chose instead to require only that the maps be "based upon" an actual and accurate survey. The inescapable conclusion, considering the burdens, benefits and language of the statute, is that to plot courses and distances, as the petitioners did on the photogrammetric map, is to base the maps on "actual and accurate survey" as the statute requires.

E. McQuillian, *Municipal Corporations* § 3.27d (rev. 3d ed. 1971) indicates that "[i]f maps or surveys are required by statute, they are sufficient if they show to a reasonable certainty what land is included. Thus, if the incorporating petition and accompanying map, when viewed together, fairly apprise the public of the property involved, the description will be considered proper." *See, e.g., People v. Ihde*, 23 Ill.2d 63, 66, 177 N.E.2d 313, 315 (1961).

The case at bar is very similar to *In Re Incorporation of Town of Big Cabin*, 132 Okla. 200, 270 P. 75 (1928). There the county surveyor testified that the map submitted with the petition for incorporation was based upon maps and field notes already on record in the county and that a complete survey of the proposed town was not made. The surveyor made an affidavit that the plat was correct, and his application was attached to the petition. The court held that this substantially complied with their statute considering the lack of evidence that anyone was misled or that anyone could not find out whether his property was in the area sought to be incor-

porated. The court found it sufficient if a surveyor can ascertain boundaries with a reasonable certainty. Similarly, in *West v. West Virginia Fair Association*, 97 W. Va. 10, 125 S.E. 353 (1924), a map submitted with an incorporation petition was held to be adequate, despite significant errors in metes and bounds, because no interested person or voter could be misled as to the general boundaries of the territories to be included.

Description of municipal boundaries need not be construed with the same strictness as those descriptions necessary in deeds, mineral leases or mining permits. The duly-verified map makes a prima facie case of compliance with the statute. The Court finds that this method of using aerial photographs, actual field information and official United States Geological Survey maps in establishing the coordinate ground control points and courses, distances and acreages which appear on the maps, substantially complies with W. Va. Code § 8-2-2 and that the objectors have not met the burden of proving that the maps submitted and verified by Mr. White were inadequate. Therefore, the order of the commission declaring the maps inadequate is contrary to the evidence adduced in this case.

## V. CONCLUSION

In summary, we have found that the statute provides for incorporation of any part of any county or counties that:

1. Is not within any municipality,

2. Is urban in character,

3. Contains at least one hundred inhabitants, and

4. Contains an average of not less than five hundred inhabitants per square mile (if the area is one square mile or more in size).

The citizens may show themselves to be with these conditions and may initiate a special election on a proposed incorporation by filing a petition that is:

1. Verified by at least one of the petitioners,

2. Signed by at least thirty percent of the free-holders of the territory to be incorporated, and

3. Accompanied by a verified map prepared by a registered professional engineer that is based upon an actual and accurate survey showing the courses, distances and the area to be incorporated.

In the case at bar, the petition filed was supported by 434 individuals and verified by one of them to be in compliance with each and every requirement of the law set forth above. The map, likewise, was expressly sworn to be in compliance with each of the statutory requirements by its maker, Harold T. White, a registered professional engineer. Our case law dictates that the petition and maps, verified to be in compliance with each and every statutory requirement, constitute a prima facie case of compliance with the Code and logically shift a burden of proving noncompliance to anyone who objects to the proposal. The corporate objectors in this case attempted to prove noncompliance in two respects. But, as discussed in detail above, they failed to meet their burden. The prima facie case remained intact on all points.

In approving those precedents which place the burden of proving inadequacy on the objectors or county commission, the Court, in part, draws instruction from history. Peter Van Winkle, delegate from Wood County, spoke out at the first constitutional convention of West Virginia in favor of popular government as "the convenience of bringing nearer to every man ... those matters in which he has most interest [enabling] every citizen to give ... his personal supervision to the affairs of his county and neighborhood ..." II Debates and Proceedings of the First Constitutional Convention of West Virginia 439 (January 17, 1982). He points out, by way of example, what he considered to be a major flaw inherent

in the system of county courts as he spoke in favor of the Jeffersonian concept of townships:

"If a citizen trail or road, if you please, of five miles opened, [the citizen] was mostly under the necessity of employing a lawyer to advocate that before the county court; and then a lawyer would appear on the other side, and all the technicalities of the law would be interposed between the gratification of the wish of a few citizens of the county or town and their object. All these legal impediments were interposed and the evil was growing constantly ... But the bringing back into the hands of the people the direct administration of such of their own affairs as they can transact with convenience to themselves is the object sought." *Id.* at 441 & 451.

The writ of mandamus is granted, and the County Commission of Logan County is hereby ordered to enter an order holding the requirements of *W.Va. Code*, 8-2-1 & 2 to be met and to proceed according to *W.Va. Code*, 8-2-4 *et seq.*

*Writ awarded.*